**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| PACKARD SQUARE LLC, | ) | |
| | ) | Case No. 17-52483 |
| | ) | |
| Debtor. | ) | Hon. Thomas J. Tucker |
| ______________________________________/ | | |

## COVER SHEET FOR MOTION

## TO OBTAIN CREDIT

The debtor has filed a motion to obtain postpetition financing, which is attached to this Cover Sheet. In accordance with LBR 4001-2(b) (E.D.M.), the debtor has identified below, by page and paragraph number, the location in the proposed order accompanying the motion of each of the following provisions:

| **Provision** | **Contained in Proposed Order** | **Location in Proposed Order** |
|---|---|---|
| (1) Provisions that grant liens on the estate's claims and causes of action arising under Chapter 5 of the Code. | ___X__ Yes<br><br>_____ No | Page 10, ¶ 10 |
| (2) Provisions that grant cross-collateralization protection to the prepetition secured creditor (i.e., clauses that secure prepetition debt with categories of collateral that were not covered by the secured party's lien prepetition) other than liens granted solely as adequate protection against diminution in value of a prepetition creditor's collateral. | _____ Yes<br><br>___X__ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (3) Provisions that establish a procedure or conditions for relief from the automatic stay. | __X___ Yes<br><br>_____ No | Page 20, ¶ 25 |
| (4) Provisions regarding the validity or perfection of a secured creditor's prepetition liens or that release claims against a secured creditor. | __X___ Yes<br><br>_____ No | Page 12, ¶ 11(b) |
| (5) Provisions that prime any lien without that lienholder's consent. | ___X__ Yes<br><br>_____ No | Page 12, ¶ 11(b) |
| (6) Provisions that relate to a sale of substantially all of the debtor's assets. | _____ Yes<br><br>___X__ No | Page ____, ¶ ____ |
| (7) Provisions for the payment of professional fees of the debtor or any committees, including any carve-outs for such payments. | ___X__ Yes<br><br>_____ No | Page 14, ¶ 17 |
| (8) Provisions for the payment of prepetition debt. | _____ Yes<br><br>___X__ No | Page ____, ¶ ____ |
| (9) Provisions that waive the debtor's exclusive right to file or solicit acceptances of a plan during the time periods specified in 11 U.S.C. § 1121. | _____ Yes<br><br>__X___ No | Page ____, ¶ ____ |
| (10) Provisions that require the debtor's plan to be on terms acceptable to the secured creditor. | _____ Yes<br><br>___X_ No | Page ____, ¶ ____ |
| (11) Provisions that require or prohibit specific terms in the debtor's plan. | _____ Yes<br><br>_X___ No | Page ____, ¶ ____ |

| | | |
|---|---|---|
| (12) Provisions establishing that proposing a plan inconsistent with the order constitutes a default. | __X___ Yes<br><br>_____ No | Page 19, ¶ 24(g) |
| (13) Provisions that waive surcharge under 11 U.S.C. § 506(c). | __X___ Yes<br><br>_____ No | Pages 13, 22, ¶¶ 14, 30 |
| (14) Provisions that address the rights and obligations of guarantors or co-obligors. | ___X__ Yes<br><br>_____ No | Pages 8- 9, ¶ 9(c) |
| (15) Provisions that prohibit the debtor from seeking approval to use cash collateral without the secured creditor's consent. | __X___ Yes<br><br>_____ No | Page 22, ¶ 30 |
| (16) Provisions that purport to bind a subsequent trustee. | ___X__ Yes<br><br>_____ No | Pages 17-18, 22, ¶¶ 22, 29 |
| (17) Provisions that obligate the debtor to pay any of a secured creditor's professional fees. | __X__ Yes<br><br>_____ No | Page 9, ¶ 9(e) |

Dated: September 5, 2017

Respectfully submitted by:

**THE DRAGICH LAW FIRM PLLC**


By: /s/ David G. Dragich
David G. Dragich (P63234)
Amanda Vintevoghel (P76567)
17000 Kercheval Avenue, Suite 210
Grosse Pointe, MI 48230
(313) 886-4550 (Telephone)
ddragich@dragichlaw.com
avintevoghel@dragichlaw.com

Proposed Counsel for Debtor Packard Square LLC

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| PACKARD SQUARE LLC, | ) | |
| | ) | Case No. 17-52483 |
| | ) | |
| Debtor. | ) | Hon. Thomas J. Tucker |

______________________________________/

**FIRST DAY EMERGENCY MOTION OF THE DEBTOR FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING, (II) SCHEDULING A FINAL HEARING, AND (III) GRANTING CERTAIN RELATED RELIEF**

Packard Square LLC (the "Debtor"), through its proposed counsel, hereby moves pursuant to sections 105, 361, 362, 363 and 364 of title 11 of the United States Code §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules of the United States Bankruptcy Court for the Eastern District of Michigan (the "Local Rules") for entry of an interim order, substantially in the form attached hereto as **Exhibit 1** (the "Interim Order") and a final order (the "Final Order," and together with the Interim Order, the "DIP Orders") (i) authorizing the Debtor to obtain post-petition financing, (ii) scheduling a final hearing, and (iii) granting related relief. In support of this motion, the Debtor relies on the *Affidavit*

*of Craig Schubiner in Support of Chapter 11 Petition and First Day Pleadings* (the "First Day Affidavit"),[1] and states as follows:

## JURISDICTION AND VENUE

1. The Court has jurisdiction over this motion pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper in this district pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory predicates for the relief sought herein are sections 105(a), 361, 362, 363 and 364 of title 11 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001 and 9014, and Local Rule 4000-2.

## GENERAL BACKGROUND

3. On September 5, 2017 (the "Petition Date"), the Debtor filed its voluntary petition for relief under title 11 of the Bankruptcy Code (the "Bankruptcy Case")[2]. The Debtor is operating its business and managing its property as debtor

---

[1] Capitalized terms not herein defined shall have the meanings ascribed to them in the First Day Affidavit.

[2] The Debtor anticipates that Canyon (as defined herein) will contest the Debtor's authority to file bankruptcy on the basis that the Debtor's operating agreement specifically disallows it. However, the operating agreement was only revised to include such provision because Canyon forced the Debtor to add it. Regardless, such provisions have been deemed improper and unenforceable. *See In re Lake Mich. Beach Pottawattamie Resort LLC,* 547 B.R. 899 (Bankr. N.D. Ill. 2016) citing *Klingman v. Levinson,* 831 F.2d 1292, 1296 (7th Cir. 1987) ("For public policy reasons, a debtor may not contract away the right to discharge a bankruptcy"); *In re Shady Grove Tech. Ctr. Assocs. Lt'd.,* 216 B.R. 386, 390 (Bankr. D. Md. 1998), *supplemented,* 227 B.R. 422 (Bankr. D. Md. 1998) (holding corporate contractual "prohibitions against the filing of a bankruptcy case are unenforceable.")

in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. As of the date hereof, no party has requested the appointment of a trustee or examiner in this Chapter 11 case, and no committee has been appointed under section 1102 of the Bankruptcy Code.

4. This Court has jurisdiction over this Chapter 11 case pursuant to 28 U.S.C. §§ 157 and 1334 and venue is properly in the United States Bankruptcy Court for the Eastern District of Michigan pursuant to 28 U.S.C. §§ 1408 and 1409.

5. No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

**Business Operations of the Debtor**

6. The Debtor is in the process of completing construction of a 360,000 square foot mixed-use development on a six and a half acre site on Packard Street in Ann Arbor, Michigan (the "Project"). Once completed, the Project would be worth approximately $93,500,000.00[3]. *See* Appraisal, attached as Exhibit A to the First Day Affidavit. In its "as-is" condition, the Project is valued at approximately $73,800,000.00. *See Id.*

7. The Project includes 249 residential units with high-end amenities, nearly 30,000 square feet of retail space and over 450 parking space including an

[3] The "Prospective Value Upon Stabilization" of the Project is $89,400,000. The appraised "Net Present Value" of the tax increment financing is $4,080,000.

underground parking garage. As of the Petition Date, the Project is approximately 65% complete.

8. The Debtor acquired the property for the Project in 2001 and built a 20+ firm team to conceptualize, design, and obtain approvals for the Project. The approvals were unanimous at all city levels with strong support from the community. The Project also involved an environmental cleanup, tax increment financing, a DEQ grant, off-site sanitary upgrades benefiting the city, two new public parks, plus a $50,000.00 contribution to the Ann Arbor park system, and more. After obtaining the necessary approvals, the Debtor prepared the construction documents, constructed a first-class marketing center, developed beautiful brochures and a first-rate website and brought in Pinnacle, the second largest property manager in the country to manage the pre-leasing of the Project. The City of Ann Arbor approved more than 300 pages of construction drawings. The Debtor also completed 2,000 pages of specifications and other documents. In doing so, the Debtor had invested over $14,000,000.00 of cash equity into the Project

9. In October 2014, the Debtor obtained a construction loan from Can IV Packard Square LLC, any entity created by Canyon Partners, a California company ("Canyon") in the amount of approximately $53,700,000.00 (the "Construction Loan"). *See* Payoff Letters (Dated: August 15, 2017), attached as Exhibit B to the

First Day Affidavit. However, the actual amount that the Canyon provided to the Debtor was approximately $30,000,000.00. *Id.*

10. As of the Petition Date, the Debtor is owned by PSMM, LLC. The Debtor was formed in 2001.

11. The Debtor does not have employees as of the Petition Date.

12. As of the Petition Date, and as noted above, the Debtor has one lender, Canyon.

13. The Debtor is currently under receivership. *See CAN IV Packard Square LLC v. Packard Square LLC,* Case No. 16-990-CB, Washtenaw County Trial Court, Honorable Archie C. Brown presiding (the "Receivership Case"). A copy of the *Order Appointing Receiver* (Dated: November 1, 2016) (the "Receivership Order") is attached as Exhibit C to the First Day Affidavit. McKinley, Inc. is currently serving as the receiver (the "Receiver"). Since its appointment, the Receiver has, and continues to, breach its fiduciary duties to the Debtor and its creditors.

**The Receivership Case**

14. Construction began on the Project in late 2014.

15. In October 2016, Canyon sued the Debtor for loan foreclosure in the Receivership Case. However, as detailed below, there was no evidence demonstrating that the Debtor defaulted on the Construction Loan.

16. The Debtor had issues with its initial construction manager. Before the loan closing with Canyon, the originally planned contractor was unable to obtain a bond as required by the Construction Loan documents. Therefore, the Debtor was forced to find a second construction manager after the Construction Loan closing. However, the milestones set forth in the Construction Loan documents with Canyon were never extended to account for this delay.

17. The Debtor began site work under direct contracts with the site contractor. However, Canyon delayed its review of the site work contracts, which caused site work milestones to be missed. Canyon then alleged that the Debtor was in default, even though the delay resulted from Canyon's inaction. A couple months later, Canyon again alleged that the Debtor was in default because it did not name a single potential replacement contractor timely, even though the Debtor had provided two options for Canyon to review. Canyon then attempted to force the Debtor to enter into a forbearance agreement to give up certain rights under the Construction Loan documents. The Debtor refused to do so. Canyon did not list these defaults in its Complaint, however, which ordinarily would have been relevant. Canyon hindered the Debtor by its repeated declaration of baseless defaults. This continued through the loan term. Canyon is now using such defaults as a means of charging default interest of 16% and excessive fees.

18. The second construction manager had several issues as well, including losing several key team members. *See* Letter to M. Page and G. Goldman (Dated: November 7, 2016), attached as Exhibit G to the First Day Affidavit. Ultimately, the second construction manager was fired by the Debtor. *Id.*

19. Shortly thereafter, several force majeure events (as defined in the applicable loan documents) resulted in union work stoppages and labor shortages occurred. These events included an electrician strike, less access to subcontractors because of the ongoing effects of the financial crisis, and the construction of the Detroit Red Wings arena and downtown area. Again, the milestones were not extended to account for these force majeure events.

20. Even though the force majeure provision of the Construction Loan documents state otherwise, Canyon refused to fund construction draws that it had previously approved; manufactured defaults which contradicted its own construction consultant's positive reports on the status of the Project; concealed the same reports and brought in a new consultant to provide false reports; and without notice, accelerated the Construction Loan, and filed its *Verified Complaint for Appointment of Receiver and Other Relief* (Dated: October 21, 2016) (the "Complaint," attached as Exhibit D to the First Day Affidavit) and *Ex Parte Emergency Motion for Appointment of Receiver* (Dated: October 21, 2016) (the "Motion to Appoint Receiver," attached as Exhibit E to the First Day Affidavit).

21. In its Complaint, Canyon alleged that the Debtor defaulted on the Loan and sought to foreclose on the Debtor's property. The Debtor vehemently denied that it defaulted on the Loan and asserts that the allegation regarding loan foreclosure were unsupported. The Debtor did not miss a payment and never made a late payment. Further, the Debtor paid all taxes and insurance in a timely fashion. In fact, the Receiver and the Debtor received letters from its architects, engineers and subcontractors describing how well the Project was moving forward, before the Receiver was appointed. *See* Letter to C. Schubiner (Dated: November 9, 2016) and Letter to M. Page and M. Goldman (Dated: November 7, 2017), attached as Exhibit G to the First Day Affidavit. The Complaint does not include any allegations against the Debtor relating to fraud, misappropriation of funds, any city violations, that the Project was over budget, or that the amount of Canyon's Construction Loan would be insufficient to complete construction. The Receivership Case is merely an attempt by Canyon to capture the Debtor's equity because the Project is poised to be even more successful than originally projected.

22. Regardless of Canyon's failure to assert any true defaults by the Debtor, the Receiver was appointed on November 1, 2016, three (3) days after the Debtor

was served with the Complaint. The Court did not conduct an evidentiary hearing, even though the Debtor objected to the appointment of the Receiver.[4]

23. The "agent" of the Receiver is Matthew Mason ("Mr. Mason"). *See* Exhibit C to the First Day Affidavit. At the time the Receiver was appointed, Mr. Mason was employed by the Receiver. However, in April 2017, Mr. Mason left the Receiver and is now employed by Conway Mackenzie. The Receiver did not inform the Court in the Receivership Case of Mr. Mason's departure. Mr. Mason is an attorney, not a real estate developer, and does not have experience in developing, building or constructing a commercial property.

24. On November 22, 2016, the Receiver entered into a receiver construction loan agreement with Canyon (the "Receiver Construction Loan"). *See* Receiver Construction Loan, attached as Exhibit H to the First Day affidavit.

**Events Leading to the Chapter 11 Bankruptcy**

25. The Receiver has mismanaged the property since its appointment. The list of problems and inadequacies is extensive. The Receiver also terminated C.E. Gleeson Construction, the most recent construction manager. The Receiver has made little progress towards completing construction since it took over the Project in late 2016 and has wasted millions of dollars. *See* Letter from C. Schubiner to J.

[4] As of the date of this filing, the appointment of the Receiver is currently on appeal to the Michigan Court of Appeals.

Fink (Dated: June 1, 2017), attached as Exhibit I to the First Day Affidavit and Letter from C. Schubiner to J. Fink (Dated: September 4, 2017), attached hereto as Exhibit J to the First Day Affidavit.

26. The Receiver is a property management firm that oversees completed buildings, and does very little "ground-up" development. The Receiver does not have experience in developing a construction project of the same magnitude as the Project. Additionally, the Receiver owns and manages at least fourteen (14) apartment complexes and retail centers in Ann Arbor, which makes the Receiver a direct competitor of the Debtor.[5] The Receiver has incentive to delay the completion of the Project to prevent another competitor from entering the Ann Arbor apartment market.[6] The Receiver also has an incentive to prolong the Project in order to collect its fees, which are substantial. *See* List of Receivership Expenses, attached as Exhibit K to the First Day Affidavit (the "Receiver's Expenses").

27. Since its appointment, the Receiver has demonstrated that it is incapable of managing the construction, development, design, marketing and/or

---

[5] See Exhibit F to the First Day Affidavit, which identifies all of the properties the Debtor manages in Washtenaw County.

[6] According to Michigan Court Rule ("MCR") 2.622(B)(6)(f), an entity may not serve as a receiver if it "has or represents an interest adverse to the receivership estate or stands in any relation to the subject of the action or proceeding that would tend to interfere with the impartial discharge of duties as an offer of the court."

leasing of the Project. Additionally, it has significantly breached its fiduciary duties to the Debtor.

28. Specifically, the Receiver is currently damaging the building, negatively impacting the current and future income stream, and is incapable of providing the expertise and attention to detail that is necessary to complete the critical finishes of the Project. *See* Exhibits I and J, attached to the First Day Affidavit.

29. The Receiver has not provided a construction schedule, which was required to be produced within 90 days of the execution of the Receiver Construction Loan. *See* Exhibit H to the First Day Affidavit, § 6.2. This is contrary to what the Receiver stated to the Washtenaw County Trial Court in the initial hearing on the Motion to Appoint the Receiver. At the hearing, Canyon's counsel stated:

> [The Receiver] is a very experienced local knowledgeable excellent company that can come in. They have a game plan already set forth of taking over this Project and bringing it to completion very quickly… They have a construction schedule that is very aggressive, very on point, that will get this Project done in a timely fashion and get it leased up. And we're here because we want the property completed, leased up and generating income. That's why we're here…

*See* Transcript of Hearing on Motion to Appoint Receiver (Dated: October 10/27/16), pp. 26-29, attached as Exhibit L to the First Day Affidavit.

30. It has become apparent that the Receiver did not, and does not, have a "game plan," a "construction schedule," or any idea on how to complete the Project quickly, or at all for that matter. The failure to have a construction schedule has resulted in millions of dollars of waste. Further, the failure to have a construction schedule, while being grossly negligent, also resulted in the failure to provide potential tenants with information for potential leasing. As a result, the Receiver is unable to pre-lease any of the Project and in fact, has ceased all efforts to lease the units or retail space. *See* Exhibit J to the First Day Affidavit, pp. 4-5. The Receiver has closed the leasing office and taken down the Project's 400-foot sign and disabled the Project's website. *See Id.* There were approximately seventy (70) deposits on the apartments before the receivership began, but the Receiver returned all of these deposits because it had no schedule for delivery of the units. The Receiver has not entered into a single lease since its appointment and has made no mention of leasing in its reports.

31. Further, the Receiver does not have a development supervisor on the Project site. It has relinquished all control to the general contractor, O'Brien Construction Company ("O'Brien Construction"). The Receiver has no on-site presence. Additionally, on most days, there are only 12-15 construction workers on site, when there should be hundreds to complete a project of this magnitude expeditiously. *Id.* at p. 1.

32. The Receiver has been in control of the Project for ten (10) months, but has made almost no progress. There is no urgency on behalf of the Receiver to complete the Project. This is exemplified by the fact that the Receiver entered into an amendment with O'Brien Construction on April 25, 2017 (six months after the Receiver's appointment) to its general construction agreement (the "Amendment"), which states that the building will not be completed until October 31, 2018. *See* Amendment, attached as Exhibit M to the First Day Affidavit. This will be close to two years after the Receiver's appointment. Prior to the appointment of the Receiver, the Debtor had a construction schedule in place with C.E. Gleeson Construction to have the Project completed by March 2017. *See* Gleeson Construction Schedule, attached as Exhibit N to the First Day Affidavit. The Project was nearly two-thirds completed when the Receiver was appointed.

33. Since its appointment, the Receiver has provided payoff letters (the "Payoff Letters") to the Debtor that include both the original Construction Loan and the Receivership Construction Loan. *See* Exhibit B to the First Day Affidavit. According to the Payoff Letters, the Receiver has spent almost $10,000,000.00.[7] Only about $1,000,000.00 has been spent on actual construction costs, with the remaining funds spent on "soft costs," including fees and billings which pre-dated the receivership. Prior to the receivership, the Debtor spent approximately

[7] The court in the Receivership Case has never approved a budget for the Project.

$2,000,000.00 on construction costs per month. *See* Borrower Construction Requisitions Summary, attached as Exhibit O to the First Day Affidavit. The Receiver's Expenses are discussed in more detail below. *See* Exhibit K to the First Day Affidavit; *See also* Exhibit I, pp. 6-14 and Exhibit J, pp. 2-3 to the First Day Affidavit.

34. The Receiver's Expenses break down as follows:

- As noted above, through the first eight (8) months of the receivership, hard construction costs incurred totaled just $995,924.86. On a building that costs approximately $30,000,000.00 in hard construction costs to build and should take 18 months in total to complete, the hard construction cost spending by the Receiver averaged $125,000.00 per month. This alone demonstrates gross negligence. Furthermore, most of the costs were not competitively bid and were paid at rates well above market levels. *See* Exhibit I to the First Day Affidavit, pp. 6-8, 14.

- $1,918,132.51 was spent on legal fees to five different law firms, all for Canyon or the Receiver.

- $1,070,647.33 was paid for work pre-dating the receivership with a substantial portion unjustly enriching subcontractors who actually owe money to the Debtor.

- $695,577.23 was paid by the Receiver to O'Brien Construction for construction fees and general conditions. This equates to 70% of the inflated hard construction costs completed. The market rate for fees/general conditions is approximately 6% of hard costs when the contractor is at risk to abide by a guaranteed maximum price and when it provides a payment and performance bond. *See* Exhibit I, p.6-8, 14 and Exhibit J at pp. 2-3 to the First Day Affidavit. In this instance, O'Brien Construction has no risk to deliver at any timeframe or guaranteed cost and has not provided any bond - so its billings should be even less than 6%. O'Brien Construction's fees and general

conditions' costs paid by the Receiver are at least 1,000% over market rates. *Id.*

- The Receiver has paid itself $219,531.01. These fees exceed the amount that is allowed under the Receivership Order by at least an extra $7,000.00 per month.

- $159,013.39 was spent on detectives, forensic accountants, security guards, storage fees and other unnecessary charges.

- $702,000.00 is alleged due for Canyon's loan interest and fees just on the Receiver Construction Loan. The Receiver Construction Loan shows $8,912,852.99 of fees and interest allegedly due during the receivership period. *See* Exhibit B to the First Day Affidavit. The Receiver, without any discussion with the Debtor, has agreed to the double charging of loan fees and interest, at the well above market rate of 16%, especially considering this is a loan that is currently a super priority first mortgage.

- $2,924,278.49 is undocumented and there is no accounting. Upon information and belief, much of this is for more legal fees to five law firms, more fees to the Receiver and more fees to O'Brien Construction. The Receiver, Canyon and their many lawyers are acting in concert to conceal these costs despite multiple requests by the Debtor to Canyon, the Receiver and their multitude of lawyers. *See* Exhibit I at p. 15, Exhibit J, pp. 3-4 to the First Day Affidavit.

35. For the construction that has been completed, the Receiver has entered into contracts well above the market rate, without a competitive bidding process. *See* Exhibit I at pp. 9-13 and Exhibit J at pp. 2-3 to the First Day Affidavit. In some instances, the Receiver has paid hundreds of percent over the market rate for work. *Id.*

36. Furthermore, the Debtor has not been permitted to see the contracts with the various subcontractors. *See* Exhibit I at p. 15 and Exhibit J at 3-4 to the First Day Affidavit. The Receiver refuses to turn them over to the Debtor. *See Id.* The Receiver has also ignored recommendations made by the Debtor and bids from respected subcontractors. *See* Exhibit I at pp. 1-2 to the First Day Affidavit and Letter to M. Mason (Dated: October 31, 2016), attached as Exhibit P to the First Day Affidavit.

37. Further, the Receiver has not followed the Project's drawings and several tasks that have been completed by the Receiver will have to be redone. *See* Exhibit J to the First Day Affidavit, pp. 5-8 to the First Day Affidavit. Specifically, a new concrete floor will have to be torn out and replaced; sanitary and fire suppression pipes will have to be raised to prevent interference with ceiling heights the elevator lobby walls will need to be torn out and re-done to provide correct windows for safety and light, certain exterior walls where fiber cement panels were destroyed must be re-done and vent pipes relocated properly to the roof, certain tile floors and walls will have to be removed because they were laid in the wrong design, walls will have to be repaired or replaced because flat-screen television outlets were put in the wrong locations, a retaining wall that was destroyed by workers will have to be replaced, and brand new landscaping will have to be re-done because the

Receiver's workers failed to first remove a fence and tree branches that are leaning on overhead powerlines before installing the landscaping. *Id.*

38. Materials and works in progress are also being improperly stored, destroyed and left unprotected. Cabinets valued at $800,000.00 are placed in humid, non-conditioned spaces that are not water tight and causing delamination. *Id.* at p. 8. Further, main electric rooms are filled with water because the Receiver let patios sit with open drains for almost a year which resulted in numerous leaks. Millions of dollars in materials are left out unprotected, in disarray, and begging for theft.

39. The Receiver refuses to communicate with the Debtor or its representatives about the construction of the Project and the subcontracts it is entering into, even though the Debtor's principal has been and is willing to assist in any way possible. *See* Exhibits I, J and O to the First Day Affidavit.

40. The Receiver has also negotiated settlements with various lien claimants – unjustly enriching them without consulting the Debtor, in complete disregard for the Debtor's claims against these parties, and despite the fact that discovery in the case has just begun. *See* Exhibit I to the First Day Affidavit, pp. 4-5 and <u>Summary of Lien Discharge</u>, attached as Exhibit R to the First Day Affidavit.

41. While the Receiver's severely poor performance continues ten (10) months after its appointment, the default rate of interest of 16%, plus significant professional fees, are still accumulating against the Debtor. As of the Petition Date,

the Debtor allegedly owes Canyon an additional $18,000,000.00 on the Construction Loan and on the Receiver Construction Loan. This amount has accumulated since the Receiver was appointed on November 1, 2016, even though the Receiver has only spent $1,000,000.00 on actual construction costs during this timeframe.

42. Further, on August 31, 2017, the Receiver and Canyon filed a motion in the Receivership Case seeking approval of an additional $17,766,816 loan to the Receiver. *See* Joint Motion to Approve Amended Receivership Loan Documents and Budget, Exhibit Q attached to the First Day Affidavit and Exhibit J to the First Day Affidavit, pp. 9-10.

43. The Debtor has exhausted all means to remove the receiver in the Receivership Case, to no avail.[8] Additionally, as evidenced by the significant correspondence between the Debtor and the Receiver, a portion of which is attached here, the Debtor has tried to work with and assist the Receiver in its completion of the Project in a timely and cost-efficient manner. These efforts by the Debtor were either ignored or went unanswered. The Receiver is also preventing the Debtor from generating a future income stream. As a result, the Receiver is depleting the Debtor's assets on a daily basis. Allowing the Receiver to continue to remain in control of the Project is not in the best interest of the Debtor or its creditors

---

[8] As noted above, the appointment of the receiver is subject to an appeal in the Michigan Court of Appeals. The Debtor also filed a motion for reconsideration relating to the appointment of the Receiver, but the motion was denied.

44. In order for the Debtor to successfully reorganize, the Receiver must be displaced. This Chapter 11 case is the Debtor's last resort to remove the Receiver and to preserve and maximize the value of the Project moving forward. In addition, this Chapter 11 case will enable the Debtor to obtain a loan to complete construction of the Project in a time-efficient and cost-effective manner. Thereafter, the Debtor will be able to pay all of its secured creditors in full, all of its unsecured creditors in full, and likely a return to all equity holders, on a much more expedited basis than the Receiver.

## RELIEF REQUESTED

45. Through this Motion, the Debtor requests that the Court enter the Order, substantially in the form as attached hereto as **Exhibit 1** (the "Interim Order"), seeking the following relief:

a. Authorizing the Debtor to obtain senior secured post-petition super priority financing ("DIP Financing") on an interim and final basis pursuant to the terms and conditions set forth in that certain DIP Commitment Letter (defined below) by and between the Debtor and Ardent Financial Fund II, L.P. (including any assignee or designee, the "DIP Lender') and in the Interim Order.

b. Authorizing the Debtor to execute, enter into deliver to the DIP Lender all documentation for the DIP Financing and any associated security

documents in form and substance satisfactory to the DIP Lender and to perform such other and further acts as may be required in furtherance of the DIP Financing and the DIP Loan Documents (defined below);

c. Authorizing the Debtor to draw on the DIP Loan, subject to the conditions precedent set forth in the DIP Loan Documents, and to use the proceeds of the DIP Loan to pay for the remaining costs related to the construction and development of the Project, the costs of administration of the Chapter 11 case and such other costs as expressly agreed to by the DIP Lender, in accordance with the DIP Loan Documents and the Budget (as defined below);

d. Deeming Canyon adequately protected on account of its prepetition liens being primed;

e. Granting the DIP Lender automatically perfected first-priority security interests in and liens on all of the DIP Collateral (as defined below) to secure the DIP Financing and all obligations owing and outstanding thereunder (collectively, the DIP Obligations), which liens and security interests shall be subject only to Permitted Liens (defined below) and the Carve-Out (defined below);

f. Granting allowed super priority administrative expense claims to the DIP Lender for the DIP Obligations;

g. Modifying the automatic stay imposed by section 362 of the Bankruptcy Code solely to the extent necessary to provide the DIP Lender with the relief necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and the Interim and Final Orders, as applicable;

h. Scheduling a hearing (the "Final Hearing"), pursuant to Bankruptcy Rule 4001(c)(2) and Local Rule 4001-2, to consider entry of the Final Order, *inter alia*¸ approving and authorizing the DIP Financing (including, without limitation, the advance of the financing pursuant to the Interim Order) on a final basis.

## BASIS FOR RELIEF

46. The Debtor has an immediate and critical need to obtain post-petition financing under the DIP Financing in order to pursue its reorganization efforts. The Debtor does not have sufficient available resources to continue the construction of the Project without the financing requested herein. Ensuring that the Project is completed competently, correctly and in the most cost effective manner is of the utmost importance for the Debtor's business operations, but more importantly, for its creditors.

47. The Debtor is unable to obtain financing in the form of unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code, as an administrative

expense under section 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority claim pursuant to section 364(a)(1) of the Bankruptcy Code, without the grant of liens on assets.

48. The Debtor has been unable to obtain funding on terms that are more favorable than offered by the DIP Lender.

49. Without the DIP Financing, the Debtor would be unable to complete the Project and its estate would decrease substantially in value and it would not be able to pursue its reorganization efforts.

50. The DIP Lender has indicated a willingness to provide the Debtor with certain financing, but only in compliance with the terms and conditions set forth in the Interim Order and the Final Order. The Debtor has concluded, in an exercise of its sound business judgment, that the financing to be provided by the DIP Lender represents the best financing presently available to the Debtor. Furthermore, Canyon's financing on the receivership loan is nearly 50% more expensive than the DIP Lender is willing to provide (i.e. Canyon's rate is 5% greater than the DIP Lender's current 11% rate). These funds will be used to complete the construction and development of the Project, cover the costs of administration of this Chapter 11 case and to pay such other costs expressly agreed to by the DIP Lender, in accordance with the DIP Loan and otherwise fund the expenses of the business.

51. The Debtor has negotiated the DIP Financing in good faith and at arm's length with the DIP Lender. The Debtor believes that the terms of the DIP Financing are fair and reasonable, reflect the Debtor's exercise of prudent business judgment, and are supported by reasonably equivalent value and fair consideration.

## SUMMARY OF PRINCIPAL TERMS OF THE DIP FINANCING

52. The following is a summary of the terms of the DIP Financing:

Type and Amount: The Post-Petition Financing will be a multiple-draw loan in the approximate amount of $22,006,132.00 (the "Maximum Commitment") that shall be available to borrow in accordance with the terms and conditions identified in the commitment letter and terms and conditions (attached here to as **Exhibit 2**, the "DIP Commitment Letter") (the "DIP Loan").

Purpose: The DIP Loan will be used in accordance with the Budget (as defined below) for (a) the construction of the Project, (b) bankruptcy-related costs and expenses, and (c) for any other purpose agreed upon by the DIP Lender and the Debtor.

Budget and Projections: Use of cash shall be subject to a quarterly budget for the period commencing on the Petition Date and ending on the Closing Date (as defined below), each in the form and substance acceptable to the DIP Lender in its sole discretion (the "Budget," attached hereto as **Exhibit 3**). The Debtor will be required to keep the Budget "in balance" as defined in the paragraph 15 of the DIP Commitment Letter.

The DIP Lender will require that the Borrower provide documentation supporting all requests for disbursement of all sources of funds and amounts available pursuant to the DIP Loan.

Priority: The DIP Loan shall be:

1. Pursuant to section 364(c)(1) of the Bankruptcy Code, entitled to superpriority administrative expense claim

status in this Chapter 11 case with priority over any and all administrative expense claims, adequate protection claims, diminution claims, and all other claims against the Debtor or its estate, whether heretofore or hereafter incurred, of the kinds specified in sections 105, 326, 328, 330, 331, 364(c), 365, 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113 or 1114 of the Bankruptcy Code, including the proceeds of avoidance actions and subject to the entry of the Final Order;

2. Pursuant to section 364(c)(2) of the Bankruptcy Code, secured by a perfected first-priority security interest in and lien on the DIP Collateral (as defined below) to the extent that such DIP Collateral is not subject to valid, perfected and non-avoidable liens as of the Petition Date;

3. Pursuant to section 364(d) of the Bankruptcy Code, secured by a perfected first-priority security interest in and lien on all DIP Collateral to the extent such DIP Collateral is subject to prior, perfected liens, which such liens shall be primed by the other liens granted to the DIP Lender (the "Priming DIP Lien"); and

4. The Priming DIP Lien shall not be subject to being treated *pari passu* with or subordinated to any other liens or security interests (whether currently existing or hereafter created), subject in each case only to permitted exceptions to be expressly agreed upon in writing by the DIP Lender in its discretion or imposed by applicable non-bankruptcy law (collectively, the "Permitted Liens").

<u>Security</u>: The DIP Loan shall be secured by, among other things, a first-priority mortgage and assignment of leases and rents (the "Security Instrument"), which shall be a first priority security interest in the Debtor's leasehold interest in certain real property known as 2502 Packard Street, Ann Arbor, Washtenaw County, Michigan and all improvements thereto.

In addition, the DIP Lender shall be secured by a first priority lien on all equipment, furniture, fixtures, materials to be

incorporated into the Improvements, and any other personal property owned by the Debtor located on or used in connection with the improvements.

Craig Schubiner (the "Guarantor") will unconditionally guaranty the Debtor's recourse obligations to the DIP Lender pursuant to a guaranty of recourse events (the "Payment Guaranty"), and a completion guaranty with respect to construction of the Project in accordance with the project documents approved by the DIP Lender (the "Completion Guaranty", and together with the Payment Guaranty, the "Guaranty").

DIP Collateral: "DIP Collateral" means, collectively, certain real property known as 2502 Packard Street, Ann Arbor, Washtenaw County, Michigan, together with all buildings, structures, and other improvements now or hereafter located on the land, and currently consisting of an approximately 65% completed mixed-use development with a five story building with 249 apartment units and ground floor and mezzanine retail space; all leases and rents; the construction contract, architect's contract, property management contract, and all other agreements now or hereafter entered into by the Debtor with any contractor in connection with construction of or on the Project and/or with any architect, engineer, or other consultant in connection with the design, engineering, construction of or on, or management of the Project; plans, specifications, and drawings with respect to the Project; an assignment of, and first priority interest in, the Debtor's reserve and deposit accounts, and all funds contained or deposited in such accounts; and certain other property described in the Security Instrument.

Security Instrument: "Security Instrument" shall mean a first-priority mortgage and assignment of leases and rents.

DIP Loan Documents: "DIP Loan Documents" shall include, but is not limited to, a construction loans agreement, promissory note, first priority mortgage and assignment of rents, first priority assignment of project documents, guaranties of payment (as to recourse events) and completion, environmental indemnity agreement and other

documents and instruments which evidence, guaranty, secure, or otherwise pertain to the DIP Loan.

Closing Date: "Closing Date" shall mean the date of execution of the DIP Loan Documents and recordation and/or filing of the Security Instrument.

Interest: Interest shall accrue at a rate of LIBOR, plus 9.75% per annum (the "Variable Rate"). The Variable Rate shall be adjusted monthly during the term to reflect changes in the LIBOR.

Maturity Date: The DIP Loan shall mature twelve (12) months after the Closing Date (the "Loan Maturity Date").

The Debtor may extend the Loan Maturity Date for two (2) additional periods of up to six (6) months each, provided that: (a) no event of default shall have occurred and is continuing, (b) the Debtor gives the DIP Lender at lease sixty (60) days prior written notice before the extension period, and (c) with that notice, pays an extension fee equal to one percent (1%) of the amount of the DIP Loan for the extension.

Payment Terms: The DIP Loan will be a non-amortizing obligation with interest-only payments made on the first day of each month, in arrears, following the initial advance of the DIP Loan.

Optional Prepayments: The Debtor may prepay the DIP Loan in whole or in part at before maturity, however, a minimum guaranteed interest of $1,200,000 will be due to the DIP Lender regardless of repayment date.

Adequate Protection Payments: Based on the value of the Project, both at completion and in its current state, Canyon is adequately protected, even after its prepetition liens are primed by the new liens granted to the DIP Lender in connection with the DIP Financing. Therefore, Canyon is not entitled to any additional form of adequate protection.

Right to Credit Bid: Pursuant to section 363(k) of the Bankruptcy Code, to the extent the Debtor pursues a sale of its assets, including, but not limited to the Project, during the course of this Chapter 11 case, the DIP Lender is entitled to credit bid the full amount of the outstanding DIP Obligations.

## APPLICABLE AUTHORITY

### A. The Debtor Should be Permitted to Obtain Post-Petition Financing Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code.

53. Section 364(c) of the Bankruptcy Code requires a finding, made after notice and a hearing, that the debtor seeking post-petition financing on a secured basis cannot "obtain unsecured credit allowable under section 503(b)(1) of the [the Bankruptcy Code] as an administrative expense." 11 U.S.C. § 364(c). In addition, section 364(d)(1) of the Bankruptcy Code, which governs the incurrence of post-petition debt secured by "priming" liens, provides that the Court, after notice and a hearing, may:

> (d)(1) authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –
>
> (A) the [debtor] is unable to obtain credit otherwise; and
>
> (B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

54. In evaluating proposed post-petition financing under sections 364(c)and (d) of the Bankruptcy Code, courts perform a qualitative analysis and generally consider similar factors, including whether:

a. unencumbered credit or alternative financing without superpriority status is available to the debtor;

b. the credit transactions are necessary to preserve assets of the estate;

c. the terms of the credit agreement are fair, reasonable, and adequate;

d. the proposed financing agreement was negotiated in good faith and at arm's-length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

e. the proposed financing agreement adequately protects prepetition secured creditors.

*See e.g. In re Aqua Assoc.*, 132 B.R. 192 (Bankr. E.D. Pa. 1991) (applying the first three factors in making a determination under section 364(c)); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987) (same); *Bland v. Farmworker Creditors*, 308 B.R. 109, 113-114 (S.D. Ga. 2003) (applying all factors in making a determination under section 364(d)).

55. For the reasons discussed below, the Debtor satisfies the standards required to access post-petition financing on a secured superpriority and priming lien basis under sections 364(c) and 364(d) of the Bankruptcy Code.

**B. The Debtor was Unable to Obtain Financing on More Favorable Terms.**

56. The Debtor solicited alternative financing proposals prior to the Petition Date. However, the Debtor was unable to procure unsecured financing. The current proposal was on the terms that were most beneficial to the estate. The Debtor believes its efforts to obtain post-petition financing therefore satisfy the standard required under section 364(c) of the Bankruptcy Code. *See e.g. In re Simasko Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing stipulation where debtor's best business judgment indicated financing was necessary and reasonable for benefit of estates); *In re Ames Dept. Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtors in possession to exercise their basic business judgment consistent with their fiduciary duties"); *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988) (where few lenders can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing").

57. Additionally, given the severity of the repercussions if the Debtor does not obtain financing - the value of the Project, as well as the Debtor's capital, will continue to diminish at a rapid rate - the Debtor does not have an unlimited amount of time to find more favorable terms. *See e.g. In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (stating that section 364(d) of the Bankruptcy Code "imposes

no duty to seek credit from every possible lender, particularly when time is of the essence to preserve a vulnerable seasonal enterprise").

**C. The DIP Financing is Necessary to Preserve the Assets of the Debtor's Estate.**

58. As noted in *supra,* the Debtor needs financing and was forced into this Chapter 11 case as a result of the severely poor management of the Receiver, to preserve the value of its business as well as to continue to construct the Project. Without the agreement of the DIP Lender to provide the Debtor with financing, the Debtor would be forced to cease construction and lose at least $20 million in the Project's value. Further, the Debtor would be forced to rely on the Receiver to complete the Project, which as evidenced by the failings described above, would certainly cause irreparable and immediate harm to the Debtor and the Debtor's creditors, as well as to the Ann Arbor citizens who could benefit from the completion of the Project. Also, as the debtor in possession, the Debtor has a fiduciary duty to protect and maximize the assets of its estate. *See In re Mushroom Transp. Co.*, 382 F.3d 325, 339 (3d Cir. 2004). The DIP Financing allows the Debtor to do so.

**D. The Terms of the DIP Financing are Fair, Reasonable and Appropriate Given the Circumstances.**

59. In considering whether the terms of post-petition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886

(Bankr. W.D. Mo. 2003); *See also In re Ellingsen MacLean Oil Co.*, 65 B.R. 385, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds).

60. The DIP Financing was negotiated in good faith and at arm's-length between the Debtor and the DIP Lender. These negotiations resulted in an agreement which will allow the Debtor to continue its operations and either successfully reorganize or complete a sale of the Project.

**E. Entry into the DIP Facility Reflects the Debtor's Sound Business Judgment.**

61. A debtor's decision to enter in a post-petition financing arrangement under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See e.g. In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (financing decisions under section 364 of the Bankruptcy Code must reflect a debtor's business judgment).

62. Bankruptcy courts generally will defer to a debtor-in-possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13. (Bankr. D. Utah 1981). The court will generally not second-guess a debtor in possession's business decisions involving a "business judgment made in good faith, upon a reasonable basis, and within the scope of [its] authority under the [Bankruptcy] Code." *Id.* at 513-14.

63. As noted above, the Debtor has exercised sound business judgment in determining that the DIP Financing does satisfy the legal prerequisites to incur debt under section 364 of the Bankruptcy Code on the terms set forth in the DIP Commitment Letter and DIP Loan Documents. The Debtor believes the DIP Financing provides the best terms that are available under the circumstances.

64. The DIP Loan is essential to enable the Debtor to avoid irreparable harm to the Debtor's business operations, assets and its creditors.

65. Therefore, pursuant to sections 364(c) and (d)(1) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter the DIP Financing and obtain the DIP Loan on the secured and administrative superpriority basis described herein.

**F. Interim Approval of the Borrowings Should be Granted.**

66. It is essential that the Debtor immediately receive financing to continue its business operations and stabilize cash flow, which will permit the Debtor to formalize a plan to complete construction of the Project, reorganize and/or conduct a going-concern sale. Therefore, the Debtor is seeking interim approval to access advances under the DIP Loan to meet its working capital needs, including paying a general contractor and subcontractors, to complete construction of the Project.

67. The Debtor submits that this Court should grant the Debtor's request for immediate authority to use the DIP Financing to prevent immediate and

irreparable harm to the Debtor's estate pending a final hearing on the motion pursuant to Bankruptcy Rule 4001(c). The ability of the Debtor to finance its operations and the availability of sufficient liquidity through the use of the DIP Financing is vital to the preservation of the Debtor's estate and business. The Debtor, therefore, seeks authority to obtain DIP Financing.

68. Bankruptcy Rule 4001(c)(2) governs the procedures for obtaining authorization to obtain post-petition financing and provides, in relevant part:

> The court may commence a final hearing on a motion for authority to obtain credit no earlier than 14 days after service of the motion. If the motion so requests, the court may conduct a hearing before such 14-day period expires, but the court may authorize the obtaining of credit only to the extent necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

69. In examining requests for interim relief under this rule, courts apply the same business judgment standard to other business decisions. *See e.g. Ames Dep't Stores,* 115 B.R. at 36; *Simasko,* 47 B.R. at 449. Under this standard, the Debtor's request for entry of the DIP Orders, in the time periods and for the financing amounts requested herein, is appropriate.

70. The Debtor believes that, under the circumstances, the terms and conditions set forth herein are fair and reasonable for the approval of the DIP Financing.

## REQUEST FOR A FINAL HEARING

71. Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtor requests that the Court set a date for the Final Hearing that is as soon as practicable, in no event later than fourteen days following the entry of the Interim Order, and fix the time and date prior to the Final Hearing for parties to file objections to the motion.

## WAIVER OF BANKRUPTCY RULE 6004(a) AND 6004(h)

72. To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

## NOTICE

73. Notice of this motion has been given to (i) the United States Trustee for the Eastern District of Michigan (the "US Trustee"), (ii) counsel for Canyon, (iii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate, (iv) all other secured creditors, (v) counsel for the Receiver, and (vi) all parties identified in Bankruptcy Rule 4001(d) (collectively, the "Noticed Parties").

## NO PRIOR REQUEST

74. No prior request for the relief sought in this Motion has been made to this Court or any other Court.

## **CONCLUSION**

WHEREFORE, the Debtor requests that this Court enter an Interim Order substantially in the form attached hereto as **Exhibit 1** and grant such other and further relief as the Court may deem proper.

Dated: September 5, 2017 Respectfully submitted by:

**THE DRAGICH LAW FIRM PLLC**

By: /s/ David G. Dragich
David G. Dragich (P63234)
Amanda Vintevoghel (P76567)
17000 Kercheval Avenue, Suite 210
Grosse Pointe, MI 48230
(313) 886-4550 (Telephone)
ddragich@dragichlaw.com
avintevoghel@dragichlaw.com

Proposed Counsel for Debtor Packard Square LLC