**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

In re:

PACKARD SQUARE LLC, Chapter 11

Debtor. Case No. 17-52483

Hon. Thomas J. Tucker

_________________________________________/

**CAN IV PACKARD SQUARE LLC'S EMERGENCY CROSS-MOTION TO: (1) EXCUSE RECEIVER FROM TURNOVER PROVISIONS; AND (2) SUSPEND THE BANKRUPTCY CASE**

In opposition to the Debtor's *First Day Emergency Motion for Order Directing Receiver to Turn Over All Property to Chapter 11 Debtor-in-Possession and Related Relief* (Docket No. 8, the "Turnover Motion"), CAN IV Packard Square LLC ("Canyon"), the Debtor's primary secured creditor, respectfully requests that the Court: (1) pursuant to 11 U.S.C. § 543(d)(1), excuse the Receiver from the turnover provisions of 11 U.S.C. §§ 543(a), (b) and (c); and (2) suspend the bankruptcy case pursuant to 11 U.S.C. §§ 305(a)(1) and 105(a) (the "Cross-Motion").

In support of its Cross-Motion, Canyon relies on the facts and authorities set forth in the accompanying brief.

WHEREFORE, Canyon respectfully requests that the Court enter an order, substantially in the form attached as Exhibit 1 hereto, denying the Turnover Motion and granting the Cross-Motion.

Respectfully submitted,

DICKINSON WRIGHT PLLC

/s/ Michael C. Hammer
Michael C. Hammer (P41705)
Doron Yitzchaki (P72044)
350 S. Main St., Suite 300
Ann Arbor, MI 48104
(734) 623 – 1696
mchammer2@dickinsonwright.com
dyitzchaki@dickinsonwright.com

Dated: September 8, 2017

*Counsel for CAN IV Packard Square LLC*

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:

PACKARD SQUARE LLC, Chapter 11

Debtor. Case No. 17-52483

Hon. Thomas J. Tucker

_______________________________________/

**BRIEF IN SUPPORT OF CAN IV PACKARD SQUARE LLC'S EMERGENCY CROSS-MOTION TO: (1) EXCUSE RECEIVER FROM TURNOVER REQUIREMENTS; AND (2) SUSPEND THE BANKRUPTCY CASE**

## I. INTRODUCTION

Business Court Judge Archie Brown of the Washtenaw County Circuit Court (the "State Court") appointed a Receiver over the Debtor's assets more than 10 months ago. The Receiver has since managed and enhanced the value of those assets responsibly, under the careful supervision of the State Court and as required by law, for the benefit of all of the Debtor's creditors. Indeed, the Receiver saved the Debtor's creditors from what would have been almost certain disaster if the Debtor's principal, Craig Schubiner, had been allowed to remain in control of the assets. Specifically, prior to the receivership, Mr. Schubiner demonstrated time and again that he was incapable of timely finishing construction of the mixed-use development project at issue, instead engaging in endless conflicts with the Debtor's general contractor, subcontractors and now lien claimants, the secured lender and the City of Ann Arbor, whereas, since taking control of the project the Receiver has stabilized the project and demonstrated that it can timely finish the project.

Prior to the Debtor's filing of this bankruptcy case, which has now caused (and appears to have been intended by Mr. Schubiner to cause) disruption of the crucial autumn construction timetable, the Receiver was on pace to begin delivering the first set of residential units in November. The Receiver will likely still be able to restore that timeline if this Court acts swiftly to grant the Cross-Motion.

By contrast, if the Debtor's Turnover Motion is granted, it is a near certainty that no units will be delivered this year. And, due to the fact that substantial work needs to be done in September and October before the winter freeze law and construction moratorium goes into effect, if the Debtor's Turnover Motion is granted it is also a near certainty that the total project completion timeline will be substantially delayed (even assuming, charitably, that Mr. Schubiner could ever get the project completed), costing Canyon and other creditors tens of millions of dollars.

Instead of filing bankruptcy before the receiver was appointed, the Debtor instead waited more than 10 months after the Receiver's appointment and after the Receiver repaired relations with the City of Ann Arbor, negotiated a Guaranteed Maximum Price contract with a highly qualified general contractor, who, in turn, negotiated contracts with its subcontractors and millions more had been expended by Canyon to complete the project, and just as the Receiver was ready to begin delivering the first residential units. Debtor filed this bankruptcy case when it did and as it did for two purposes, neither of which supports wresting control of the project from the Receiver. The first was to indulge Mr. Schubiner's irrational desire to control the final phases of the project, even at the risk of blowing it up to the severe detriment of Canyon and all other creditors. The second was to attempt to re-litigate claims and issues that the Debtor has already raised before Judge Brown and lost on (and which Mr. Schubiner has already taken up

on appeal) – claims and issues that are now barred by collateral estoppel from being re-litigated in this Court. Indeed, in the last 10 months, Mr. Schubiner has already been sanctioned multiple times by the State Court for attempting to interfere with the receivership in various ways. The filing of this bankruptcy case is just the latest and most drastic attempt at interference.

In short, as further detailed below, this is a "posterchild case" for the Court to exercise its discretion to excuse the Receiver from the turnover provisions of the Bankruptcy Code and to suspend the bankruptcy proceeding while the State Court continues to oversee the receivership through its conclusion.

## II. STATEMENT OF FACTS

The following facts are supported by the Verified State Court Complaint attached hereto as **Exhibit A** (without its voluminous exhibits), the transcript of the receivership hearing in the State Court attached hereto as **Exhibit B**, and the Declaration of Matthew Mason (and the exhibits thereto) attached hereto **Exhibit C**. In the event the Court sets an evidentiary hearing on the Turnover Motion and/or Cross-Motion, Canyon may supplement the record with additional evidence.

### A. The relationship between the parties, the Debtor's defaults, and the appointment of the Receiver to prevent financial disaster.

1. Canyon is the Debtor's primary secured creditor and is owed approximately $51 million by the Debtor. In 2014, Canyon loaned the Debtor funds to construct a mixed-use development on Packard Road in Ann Arbor, consisting of a 4-story structure with 23,642 square feet of ground level retail space and 249 residential units, an outdoor courtyard area, swimming pool, fitness area, and other amenities (the "Project") on which Canyon holds a first lien. The loan required the Project to be substantially completed by October of 2016.

2. The Debtor repeatedly defaulted on the loan agreement by, among other things, missing crucial construction milestones. Even after these milestones were repeatedly extended by Canyon, the Debtor continued to miss them. The Debtor further defaulted by failing to pay contractors and allowing approximately $9.8 million in construction liens to attach to the Project based on the Debtor's actions during the time it controlled the Project.

3. In October of 2016, as winter approached and the Debtor had not made even the necessary construction progress to protect the Project from the winter weather (let alone substantially completed the Project), and only after the Debtor fired its general contractor, which threw the Project into chaos, Canyon filed suit in the State Court and, on November 1, 2016, obtained appointment of McKinley Inc. as Receiver over the Project (the "Receiver"). McKinley is one of the top, if not the top, real estate companies in Ann Arbor and has a wealth of experience overseeing "ground up" developments, leasing those developments, and managing those developments.

4. During the hearings in the State Court regarding appointment of the Receiver, the State Court heard each of the spurious issues that the Debtor seeks to re-litigate in its Turnover Motion and rejected them. The State Court found that the Debtor had defaulted under the loan agreement, was in continuing default of the loan agreement, that no force majeure event occurred that excused its performance, that the Receiver is well-qualified to oversee the construction of the Project and that the Receiver has no conflict of interest. *See* Exhibit C, pp. 52-57. The Debtor is barred by collateral estoppel from re-litigating these same issues in this Court because

they were already necessarily determined by the State Court in a final order. *People v. Gates*, 452 N.W.2d 627, 630 (Mich. 1990).[1]

5. On November 18, 2016, pursuant to a joint motion of the Receiver and Lender, and over the objection of the Debtor, the State Court approved a loan from Canyon to the Receiver of up to $19,691,682.86 to continue construction of the Project (the "Receiver Loan").

**B. The prudent actions of the Receiver have already greatly benefited the Debtor's creditors.**

6. Since entry of the Receivership Order, the Receiver has secured and winterized the Property, has assessed the condition of the Property, has hired a general contractor, O'Brien Construction Company ("O'Brien"), which in turn has already negotiated and entered into various subcontractor agreements necessary to complete construction of the Project. O'Brien has worked on the Project since November 2016 and is prepared to complete construction pursuant to an already negotiated Guaranteed Maximum Price contract (the "GMP" identified and defined below).

7. Specifically, and contrary to Debtor's claims, shortly after being appointed, the Receiver developed the process for the selection of general contractor for the Project. The Receiver first considered C.E. Gleeson Contractors, Inc. ("Gleeson") for that role because Gleeson was on site at the time of commencement of the State Court Action and the appointment of the Receiver.[2] However, after careful vetting, the Receiver determined that Gleeson was not

---

[1] A receivership order is considered a final order under Michigan law if the Court that enters the receivership order expressly states in the order that it is a final order. MCR 2.604(B). The State Court so stated on p. 9 of the Receivership Order, and the Debtor relied on the finality of the order in appealing the order to the Michigan Court of Appeals by right (rather than by application for leave, which is necessary with an interlocutory order).

[2] As noted above, Gleeson was not the original general contractor hired by the Debtor. The Debtor fired its original contractor just shortly before Canyon filed suit. Gleeson was only on

capable of performing the work required of the Project. The firm did not appear to have ever worked in Ann Arbor and appeared to have no connections to the City Staff which would be requisite to smooth permitting transition, and further appeared to have had no experience with a project of this size. The Receiver considered Gleeson unqualified for the work.

8. Eliminating Gleeson from consideration, and after considering its other choices, the Receiver ultimately chose O'Brien to perform the work on the Project. O'Brien is a large firm with substantial experience both of the type of construction necessary to complete the Project and with City of Ann Arbor, which again, the Receiver viewed as a chief requirement to completing the Project. O'Brien had, at that time, recently finished for McKinley a successful new construction multifamily project in Ann Arbor.

9. Initially, the Receiver retained O'Brien to secure the Property. In doing so, numerous construction defects were discovered. These discoveries and the necessities of work required to ensure that the Project was not damaged during the winter months led the Receiver to request and the State Court, over the objection of the Debtor, to authorize the expenditure of approximately $2.4 million to fund the immediate work needed on the Project. That work was completed and those funds were fully advanced and spent by April, 2017.

10. While the initial work to secure the site was ongoing, O'Brien began the process to first determine the scope of work required to complete the Project and then to bid out that work to trade contractors. The first bid leveling documents were prepared and delivered to the Receiver in February of 2017.

11. Each trade was competitively bid to the available trade contractors in the Metro Detroit area. This Project had unfortunately suffered from a very poor payment history and

---

site for a short period of time prior to the receivership but performed no substantive work toward completing the Project.

working conditions according to the existing subcontractors on the job as well the negative history surrounding the Project. Thus, O'Brien had difficulties finding qualified subcontractors willing to bid on the Project.

12. Nevertheless, for most items O'Brien was successful in finding multiple contractors to bid.

13. By the spring of 2017, O'Brien had narrowed the scope of the work and began awarding trade work to subcontractors.

14. Months of negotiation ensued to reach a final Guaranteed Maximum Price ("GMP") agreement with O'Brien. The GMP was prepared and finalized and O'Brien has executed it. The GMP price is $25,698,267 and does not include building out the retail space, which will cost extra.[3]

**C. The Receiver must remain in control to timely complete the Project.**

15. Since June 2017, the Property has been adequately staffed and work has been completed at a steady pace. OCC was on task to complete the exterior work prior to any weather moratoriums.

16. At the same time as O'Brien was preparing its GMP and schedule, the Receiver was working with the City of Ann Arbor to obtain other extraordinary relief. Given the Receiver's good will with the City of Ann Arbor, City Officials agreed to allow the Receiver to phase temporary Certificates of Occupancy so that the Receiver could turn over blocks of units at a time. Based on this accommodation from the City of Ann Arbor, the Receiver was on task to

[3] Contrary to the Debtor's assertions in the Turnover Motion, the Receiver has routinely kept the Debtor apprised of what is going on with the Project, including relevant contracts etc., and has provided all information to the Debtor required by the State Court. The Debtor's real complaint is that Mr. Schubiner is not in control and does not get to tell the Receiver what to do, which is inherent in any receivership.

turn over 31 units (30 for lease and 1 model apartment) on or about October 31, 2017. Leasing of the 30 units was about to begin shortly. If the exterior work is not completed by the weather moratorium deadlines, there will be no occupancy until at least Spring 2018.

17. To date, the Receiver has incurred costs on the Project of $8,912,852.99.

18. The Receiver, O'Brien and its subcontractors are poised to complete construction of the Project under the recently negotiated the GMP.

19. The GMP price exceeds the original Receiver Loan principal amount and the budget the State Court approved. Accordingly, on August 31, 2017, the Receiver and Lender filed a Joint Motion to Approve Amended Receivership Loan Documents and Budget (the "Joint Motion").

20. There are numerous reasons supporting the Receiver's projected cost to complete the Project which exceeds the original Receiver Loan, which was based on the Debtor's budget.

21. For instance, the costs overruns are due to the unrealistic original construction budget of Debtor and its agents. By way of example only, and not by way of limitation, the painting for the Project was originally budgeted at approximately one-third of the Receiver's lowest bid and the drywall was budgeted at approximately half of the appropriate amount. It would have been unrealistic to complete these items at the amounts set under the original budget and the scope of work between the Debtor and the Debtor's general contractor. Moreover, the Project is supposed to be a luxury building with fine finishes. The original budget was so askew that, even staying as cost efficient as possible, the costs for the required finishes are approximately two to three times more than was originally budgeted.

22. Second, the amounts spent to correct Debtor's deficient work have significantly driven up the cost of finishing the Project. Examples of such deficient work are listed in the Receiver's previous affidavits and Receiver Reports submitted to the State Court.

23. Third, due to the reputation this Project (and the Debtor) had in the local construction industry, it took significant time and costs to develop the good will needed to bring subcontractors back to the site. Thus, new firms, which bid on the project, had to include mobilization costs in the bids. Notwithstanding such issues, O'Brien was able to obtain competitive bidding for each trade, although the bid amounts, for the most part, exceeded the cost to complete contained in the Debtor's original budget.

24. Finally, there are significant expenses that were not included in the original Loan Agreement between Plaintiff and Debtor. Examples of additional fees not previously budgeted for in the original budget include payment of: (a) real estate taxes beyond the timeline contemplated in the original loan; (b) insurance beyond the timeline contemplated in the original loan; (c) on-site security; (d) Receivership fees and expenses; and (e) lender legal and oversight costs.

25. All of the foregoing items have contributed to the increased cost to complete the Project.

26. The GMP budget noted above is necessary to complete the remaining phases of construction and to obtain a certificate of occupancy.

27. On the eve of the hearing on the Joint Motion, Debtor filed its petition in this Court under Chapter 11 and filed its Turnover Motion.

28. The Turnover Motion seeks simply to replace the Receiver's general contractor, O'Brien, and all of its subcontractors with Debtor's general contractor and its subcontractors.

29. As noted, the Receiver's general contractor and subcontractor have signed contracts and were working at full speed up until the Debtor's Chapter 11 filing on Tuesday, September 5th.

30. On the other hand, Debtor has no guaranteed maximum price contract with its general contractor based on signed contracts with subcontractors that will ensure completion of the Project. The Debtor also has no immediately available financing to pay contractors to continue working.

31. In the Receiver's opinion, no other contractor, including particularly Gleeson (Debtor's contractor of choice) would be able to finish this Project on the same schedule as O'Brien has established, or at the same cost. It would be fatal to the Project to have any delay at this point in the season. If the exterior work is not complete by November 15, 2017, there will substantial delay.

32. Consistent with that fact, the Debtor's best case scenario, which assumes City of Ann Arbor cooperation, which Debtor cannot ensure, is a delay of at least a year, which will result in greatly increased costs and lost rental revenue or simply result in the Project being left unfinished in a state of disrepair.

## III. ARGUMENT

### A. The Court should excuse the Receiver from the turnover provisions of the Bankruptcy Code because doing so is in the best interest of creditors.

The Court should excuse the Receiver from the turnover provisions of Sections 543(a), (b) and (c) of the Bankruptcy Code because doing so is in the best interests of creditors. Section 543(d)(1) of the Bankruptcy Code provides:

> After notice and a hearing, *the bankruptcy court…may excuse* compliance with subsection (a), (b), or (c) of this section if the interests of creditors and, if the debtor is not insolvent, of equity

> security holders, *would be better served by permitting a custodian to continue in possession, custody, or control of such property[.]*

11 U.S.C. § 543(d)(1) (emphasis added). The Receiver constitutes a "custodian" under the Bankruptcy Code to which Section 543(d)(1) applies. 11 U.S.C. § 11(A); *In re Franklin*, 476 B.R. 545, 551 (Bankr. N.D. Ill. 2012).

Because the Debtor is insolvent[4], the Court is only required to consider the interests of the Debtor's creditors in determining whether to excuse the Receiver from the Bankruptcy Code's turnover provisions; the Court is not required (and indeed may not be permitted) to consider the interests of the Debtor or its equity holders, in making the determination. *See In re Falconridge, LLC*, 2007 WL 3332769 at*7 (Bankr. N.D. Ill. 2007) ("The interests of the debtor are not to be considered in the court's decision.") (citing *Dill v. Dime Sav. Bank (In re Dill)*, 163 B.R. 221, 225 (E.D.N.Y. 1994); *Foundry of Barrington P'ship v. Barrett (In re Foundry of Barrington P'ship)*, 129 B.R. 550, 557 (Bankr. N.D. Ill. 1991)).

Courts have considered a number of factors "to determine whether the creditors' best interests would be served by permitting [a] receiver to retain control of the debtor's estate beyond the filing of [a] Bankruptcy case." *Franklin*, 476 B.R. at 551. These include: (1) whether turnover would be injurious to creditors; (2) whether the debtor will actually use the property for the benefit of its creditors; (3) whether there were instances of mismanagement by the debtor; (4) the likelihood of reorganization and the probability that funds required for reorganization will be available. *Id.* (citing cases). Ultimately, however, "[r]egardless of what factors are used to aid the court in its decision, the paramount and sole concern is the interests of all creditors." *Falconridge*, 2007 WL 3332769 at *7.

---

[4] The Debtor cannot pay its debts as they become due. In terms of balance sheet equity, the Debtor is either insolvent or, at best, there is a small amount of equity.

Although most reported Section 543(d)(1) cases involve a clearly insolvent debtor, the courts appear to apply the same analysis even when the debtor and its secured lender agree that the debtor is not insolvent or agree that there is equity in the property at issue. *See, e.g.*, *In re LCL Income Prop., L.P. VI*, 177 B.R. 872 (Bankr. S.D. Ohio, 1995) (allowing a receiver to remain in control of an apartment complex even though the debtor had equity in the property, and even though there was no evidence of mismanagement by the debtor, because doing so was in the best interest of creditors). Accordingly, the Court's analysis should not be materially affected by whether or not the Court believes that the Debtor has equity in the Project (which Canyon disputes).

Bankruptcy courts have repeatedly applied Section 543(d)(1) at the request of a debtor's primary secured lender that, as here, obtained a state court-appointed receiver over mortgaged real property prior to commencement of the bankruptcy case. For example, in *Foundry*, the court allowed a receiver to remain in control of a 50% occupied shopping center at the request of the center's secured lender. *Foundry*, 129 B.R. at 557-558. The court found that the because the lender and the receiver had a substantial interest in enhancing the value of the center, there was "no reason to believe that other creditors' interests will suffer by keeping the debtor out of possession of the property." *Id.* at 558. The court further found that "should it be necessary to advance funds for operating expenses or tenant improvements, Prudential [the secured lender] is more likely to cooperate in that regard with a receiver in place." *Id.*

Similarly, in *Franklin*, the court allowed a receiver to remain in control of the debtor's rental property as requested by the secured lender in part because a court-appointed receiver is required to prudently manage property in his custody. *Franklin,* 476 B.R. at 553. The court recognized:

> A private business owner may choose to engage in risky behavior to increase profitability…but the Receiver cannot do so…. *The Receiver in the instant case has no reason to engage in risky behavior that would be contrary to proper management of the Property. If the Property remains in the hands of the Receiver, it is highly likely that he will continue to engage in good business practices and continue with his plan to bring the Property into a financially stable situation suitable for meeting the financial obligations required by the mortgage and arrearage.* The Debtor will be unable to provide any benefit to the Creditors while the Receiver will be more likely to establish a financially sound condition for the Property. *Any turnover [of] responsibility will therefore be injurious to the Creditor.*

*Id.* at 553 (emphasis added).

Similarly, in *LCL*, 177 B.R. at 875-876, the court allowed a receiver to remain in control of an apartment complex as requested by the junior mortgagee despite finding no evidence of prior mismanagement of the property by the debtor and even though the debtor had equity in the property. The court noted in support of its decision that the debtor had, on three prior occasions, failed to make promised refinancing materialize and that the debtor could continue to seek refinancing even while the receiver continued to control the property. *LCL*, 177 B.R. at 875-876. The court also found that "dislocation in management" could result "in unnecessary trouble and expense" and that it was better to "leav[e] matters in the status quo" while the debtor attempted to reorganize. *Id.* at 876. The court found that maintaining the status quo would best protect the interest of creditors. *Id.* Other bankruptcy cases are in accord. *See e.g. In re Sundance Corp.* 83 B.R. 746, 750 (Bankr. D. Mont. 1988) (receiver to remain in control of apple orchard, funded by secured lender, to maintain status quo in best interest of creditors); *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 240 (Bankr. W.D. Mo. 1989) (receiver to remain in control of three apartment complexes until the court "sees if debtor in possession can achieve a confirmed plan"); *Falconridge*, 2007 WL at *7 (receiver to remain in control of apartment complex where it was

"too early in this case to evaluate the Debtor's likelihood or potential to reorganize itself successfully").

Here, the interests of creditors, including Canyon which is the Debtor's primary secured creditor and is currently owed approximately $51 million by the Debtor, will be indisputably better served by excusing the Receiver from the turnover provisions. The reasons for this are set forth in detail in Section II above, but can be summarized as follows:

1. The Receiver has timely paid all post-receivership debts in the ordinary course of business, except for those amounts that were in the process of being paid when the bankruptcy petition was filed and which therefore could not be paid.
2. The List of the Creditors Holding the 20 Largest Unsecured Claims totals less than $625,000, of which more than $350,000 consists of debts owed to law firms that have done prior work for the Debtor but which the Debtor failed to pay.
3. The Receiver has already secured the necessary funding from Canyon to complete the Project per the GMP, while both the Debtor's funding and its plans for completion of the Project remain highly speculative.
4. Prior to the Receivership, the Debtor stiffed $9.8 million of lien claimants who are parties to the State Court Case and are actively participating to protect their rights and remedies.
5. Prior to the Receivership, the Debtor has had endless disputes with its general contractor, subcontractors, the City of Ann Arbor and lender, which resulted in multiple lawsuits and the firing of the general contractor. Since the Receivership, there have been no material disputes between the Receiver, the general contractor, subcontractors and the lender.

6. The Receiver has a fully vetted GMP contract with all subcontractors signed to contracts, sufficient funding with its lender to complete the Project and the support of the City of Ann Arbor. The Debtor has none of those things.
7. The Receiver is already situated and extremely qualified to act as a leasing agent, so that units can start being leased as soon as possible to generate income for creditors. The Debtor offers no comparable benefit.
8. Every additional day that it takes to complete the Project costs Canyon and all of the Debtor's creditors money, even assuming that the Debtor could even finish the Project at all were the Debtor to wrest control from the Receiver.

Here, as in all of the above-cited cases, the interests of the Receiver are already aligned with that of the Debtor's creditors. The Debtor's interests do not appear to be so aligned (as evidenced by the timing of it bankruptcy petition, which appears to have been designed to cause as much disruption to the construction schedule of the Project as possible). There is simply no reason to jeopardize the Debtor's creditors, including Canyon, by transferring control of the assets from the Receiver back to the Debtor (who has already been determined by the State Court not to be best positioned to control those assets). For this reason, the Receiver should be excused from the turnover provisions of the Bankruptcy Code.

**B. The Court should suspend the bankruptcy case pursuant to 11 U.S.C. §§ 305(a)(1) and 105(a).**

In addition, the Court should suspend the bankruptcy case to allow the Receiver to continue to act under the continued supervision of the State Court, so as to avoid the unnecessary expense and delay which will otherwise be generated by the bankruptcy proceedings and to avoid any future confusion as which court's supervision the Receiver will act under.

Section 305(a)(1) of the Bankruptcy Code provides:

> The Court, after notice and a hearing, may dismiss a case under this title, *or suspend all proceedings in a case under this title, at any time if…the interests of creditors and the debtor would be better served by such dismissal or suspension.*

11 U.S.C. § 305(a)(1) (emphasis added). Section 543(d)(1) and Section 305(a)(1) were designed to work in compliment to each other. *See KCC-Fund*, 96 B.R. at 240 ("Colliers and the legislative history emphasize that section 543(d) was designed to reinforce the abstention policy of 11 U.S.C. § 305") (citing Collier on Bankruptcy, 15th Edition, ¶ 543.01 and H.R. Rep. No. 95-595, 95th Cong., 1st Sess. 370 (1977); S. Rep. No. 95-989, 95th Cong., 2d Sess. 84-85 (1978), U.S. Code Cong. & Admin. News 1978, p. 5787)); *Falconridge*, 2007 Westlaw 3332769 at *6 (same); *see also In re Stratesec, Inc.*, 324 B.R. 156, 158 (Bankr. D.D.C. 2004) ("§§ 305 and 543(d)(1) implicitly require the bankruptcy court to decide which will be allowed to operate, and which will be suspended, the receivership or the bankruptcy case.").[5]

Not surprisingly, the pendency of a state court receivership has been recognized as providing good grounds for suspending a bankruptcy case under Section 305(a)(1). *See In re Newport Offshore Ltd.,* 219 B.R. 341, 354–55 (Bankr. D.R.I. 1998) ("§ 305 provides that a bankruptcy court may dismiss a bankruptcy case or suspend proceedings within it in appropriate circumstances, which may include the pendency of state court receivership proceedings that

---

[5] Section 105(b), which prevents a bankruptcy court from "appointing a receiver", has been held not to prevent a bankruptcy court from allowing a receivership begun in another court to continue while the bankruptcy case also proceeds forward. *See generally In re Olympia & York Maiden Lane Co., LLC*, 233 B.R. 662, 666–67 (Bankr. S.D.N.Y. 1999) and the authorities cited therein. In other words, it does not appear that the Court is required to suspend the case simply because it grants a motion under Section 543(d)(1) to allow the Receiver to remain in control of property. At the same time, the law is very unsettled in a chapter 11 as to what exactly the duties and powers of a receiver are within the bankruptcy case (as opposed to which duties and powers are retained by the debtor or an appointed chapter 11 trustee) if the case is not dismissed or suspended. The unsettled nature of the law in this area, and the confusion, duplication of effort, expense and delay it is likely to cause, militates in favor of suspending the bankruptcy case while the State Court action proceeds, rather than having both actions proceed in parallel.

appropriately serve the interests of involved parties."); 2 Lawrence P. King, Collier on Bankruptcy ¶ 305.02[2][c] (15th ed. rev. 1997) ("when the debtor has been in receivership for so long that the bankruptcy case would be duplicative and wasteful, courts have deferred to state courts and abstained under section 305(a)(1)."); *In re Picacho Hills Utility Co., Inc.*, 2013 WL 1788298 (Bankr. D.N.M. 2013) (suspending bankruptcy case to allow receivership to proceed in state court in conjunction with granting the receiver's motion under Section 543(d)(1)); *see also In re Whitby*, 51 B.R. 184, 186 (Bankr. E.D. Mich. 1985) (suspending bankruptcy case pending resolution of a pending state court action between the debtor and his primary creditor).

Here, the interests of creditors and the Debtor would be better served by suspension of the bankruptcy case, rather than having the Receiver retain control over the property while the Debtor proceeds to try to reorganize simultaneously in a parallel bankruptcy proceeding. All of the key parties-in-interest are already before the state court and may be heard in that forum, including all the substantial construction lien claimants. The state court has already been overseeing the Receivership for nearly a year and is well-acquainted with (and, as demonstrated above, has already decided) the issues which the Debtor is now attempting to re-ligate in this Court. In other words, this is exactly the type of case that lends itself to the abstention policies embodied in Section 305(a)(1) of the Bankruptcy Code.

## IV. CONCLUSION

For all of the foregoing reasons, Canyon respectfully requests that the Court deny the Turnover Motion and grant the Cross-Motion.

Respectfully submitted,

DICKINSON WRIGHT PLLC

/s/ Michael C. Hammer
Michael C. Hammer (P41705)
Doron Yitzchaki (P72044)
350 S. Main St., Suite 300
Ann Arbor, MI 48104
(734) 623 – 1696
mchammer2@dickinsonwright.com
dyitzchaki@dickinsonwright.com

Dated: September 8, 2017

*Counsel for CAN IV Packard Square, LLC*