UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Case No. 17-52483

PACKARD SQUARE LLC,                                 Chapter 11

                    Debtor.                          Judge Thomas J. Tucker
_____/

**OPINION REGARDING DEBTOR'S POST-PETITION FINANCING MOTION**

**I. Introduction**

      This Chapter 11 case is before the Court on the Debtor's motion under 11 U.S.C.

§§ 364(c)(1) and 364(d) for approval of post-petition financing, filed September 5, 2017, entitled

"First Day Emergency Motion of the Debtor for Entry of Interim and Final Orders (I)

Authorizing Debtor to Obtain Post-Petition Financing, (II) Scheduling a Final Hearing, and (III)

Granting Certain Related Relief" (Docket # 13, the "Motion").  The Court held a preliminary

hearing on the Motion on September 13, 2017.  Several creditors filed objections to the Motion

before the hearing, including several creditors claiming to have construction liens on the

Debtor's real property.  Those objections were all styled as "limited" objections.[1]  The primary

filed objection to the Motion is not limited in nature, but rather objects to the Motion on

numerous grounds, including a lack of adequate protection.  That is the objection filed by the

---

[1] Objections were filed by Quandel Construction Group, Inc. (Docket # 49)(claiming mechanic's lien); Gaylor Electric, Inc. (Docket # 52) (claiming construction lien); Zeeland Lumber and Supply Co. (Docket # 59) (claiming construction lien); and E.L. Painting Co. (Docket # 64).  The written objection filed by E.L. Painting Co. was stricken as untimely, by an order entered on September 12, 2017 (Docket # 65).

      The United States Trustee did not file any written objection to the Motion.  The United States Trustee appeared at the September 13, 2017 hearing, and its counsel stated that some of the terms of the Debtor's proposed debtor-in-possession ("DIP") financing order need to be modified, but that otherwise the United States Trustee does not object to the Motion.

Debtor's pre-petition secured lender, CAN IV Packard Square LLC ("Canyon").[2]

The Court held an evidentiary hearing on the Motion, limited to the issue of adequate protection as described below, on September 19 and 20, 2017, then took the matter under advisement. The Court has considered all of the evidence presented at the evidentiary hearing, and all of the arguments of the parties. This opinion states the Court's findings of fact and conclusions of law regarding the Motion and the subject matter of the evidentiary hearing. For the reasons stated in this opinion, the Court will deny the Motion.

## II. Jurisdiction

This Court has subject matter jurisdiction over this bankruptcy case and this contested matter under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1), and Local Rule 83.50(a) (E.D. Mich.). This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(D) and 157(b)(2)(O).

This proceeding also is "core" because it falls within the definition of a proceeding "arising under title 11" and of a proceeding "arising in" a case under title 11, within the meaning of 28 U.S.C. § 1334(b). Matters falling within either of these categories in § 1334(b) are deemed to be core proceedings. *See Allard v. Coenen* (*In re Trans–Industries, Inc.*), 419 B.R. 21, 27 (Bankr. E.D. Mich. 2009). This is a proceeding "arising under title 11" because it is "created or determined by a statutory provision of title 11," *see id.*, including Bankruptcy Code §§ 364 and 361. And this is a proceeding "arising in" a case under title 11, because it is a proceeding that "by [its] very nature, could arise only in bankruptcy cases." *See id.* at 27.

## III. Background

## A. The Construction Loan

_____

[2] Canyon's written objection is found at Docket # 53.

Pre-petition, in October 2014, the Debtor obtained a construction loan from Canyon in the maximum principal amount of $53,783,184,00 (the "Construction Loan") to finance the construction of "a 360,000 square foot mixed-use development [project] on a six and a half acre site on Packard Street in Ann Arbor, Michigan," including "249 residential units with high-end amenities, nearly 30,000 square feet of retail space and over 450 parking space[s] including an underground parking garage" (the "Project").[3] The Debtor signed a promissory note, and other loan documents, and granted Canyon a mortgage on the real property of the Project "together with the related easements, privileges and licenses, and the buildings, structures, improvements, fixtures and personal property located [on it]" to secure the Debtor's indebtedness for the Construction Loan.[4] The Debtor also executed an assignment of leases and rents in favor of Canyon.[5]

## B.  The appointment of a receiver in the state court suit

On October 21, 2016, Canyon filed suit against the Debtor in Washtenaw County Circuit Court, in the case of *CAN IV Packard Square LLC v. Packard Square, LLC, et al.,* Case No. 16-000990 CB (the "state court case").  In its verified complaint in the state court case, Canyon requested the appointment of a receiver over the property securing its debt, due to the Debtor's alleged failure "to fulfill its obligations to complete construction of improvements for which funds were provided in accordance with the relevant loan agreements" and "to maintain the

---

[3]  Affidavit of Craig Schubiner in Support of Chapter 11 Petition and First Day Pleadings ("Schubiner Aff.") (Docket # 7) at ¶¶ 6-7; Plaintiff's Verified Complaint for Appointment of Receiver and Other Relief (the "state court complaint") (Ex. A to Docket # 28) at ¶¶ 12, 15.

[4]  *See* state court complaint at ¶¶ 14-18; Order Appointing Receiver (Ex. C to Docket # 7) at 2 ¶ B.

[5]  *See* state court complaint at ¶ 14.c.

[p]roperty is a suitable condition."[6]  Canyon also sought foreclosure of its mortgage in the state court complaint.[7]

On October 27, 2016, the state court held a hearing in which it heard oral argument regarding the appointment of a receiver.[8]  Counsel for Canyon and counsel for the Debtor both appeared at the hearing and argued their respective positions at length, for and against the appointment of a receiver.  During the hearing, Canyon alleged, in relevant part, that there had been multiple material defaults by the Debtor, in the form of missing critical construction milestone dates under the terms of the Construction Loan and the mortgage, despite Canyon having granted some extensions of those dates.  Canyon alleged that, among other defaults, the Debtor had defaulted by missing the "substantial completion date which was October 25[, 2016]," and that the Debtor had defaulted on its obligation to enclose the building of the Project by July 1, 2016, which was "a critically important aspect of the [construction] schedule" to avoid damage to the building, from the inclement weather that had already occurred and that would be getting worse due to the approaching winter season.[9]  Canyon alleged that although it had worked with the Debtor and extended the original contractually-agreed date of July 1, 2016 to August 26, 2017, the Debtor had also defaulted on its promise to enclose the building by the extended date.[10] According to Canyon, that default still had not been cured, and the building was "still open and

---

[6]  *Id.* at ¶ 2.

[7]  *Id*. at ¶¶ 75-82 (Count II Foreclosure of Mortgage).

[8]  *See* Tr. of Oct. 27, 2016 hearing in the state court case (Ex. B to Docket # 28).

[9]  *Id.* at 10-14, 28, 31.

[10]  *Id.* at 13.

4

exposed to the elements" at the time of the hearing.[11]  Canyon also alleged that Gaylor Electric

Inc. d/b/a Gaylor, Inc. ("Gaylor") and Jermor Plumbing & Heating, Inc. ("Jermor"), two

subcontractors who had worked on the Project but had not been paid, had recorded construction

liens against the property subject to its mortgage, and that more liens would soon be filed based

on the Debtor's firing of Quandel Construction Group, Inc. ("Quandel"), the former general

contractor for the Project.[12]  Canyon informed the Court that due to the Debtor's defaults, it had

accelerated the promissory note and so the promissory note was due and owing in full.  Canyon

argued that "under either the [parties'] contract or the Construction Lien Act, the [c]ourt was

authorized to appoint a receiver under the current existing circumstances" because the Project

was only partially completed; the Debtor had defaulted on its obligations under its contract with

Canyon; and the building was not enclosed and at risk of being damaged.[13]

The Debtor argued that although there had been "technical defaults" due to missed

construction milestone dates, the Debtor was entitled to an extension of the construction

milestone dates of "up to 150 days" due to the force majeure clause in the parties' loan

agreement.[14]  Debtor also argued that the "fundamental equities" of the case favored denying

Canyon's request for the appointment of a receiver.[15]

At the conclusion of the hearing, the state court gave a bench opinion in which it rejected

---

[11] *Id.*

[12] *Id.* at 8-9, 28.

[13] *Id.* at 13-14.

[14] *Id.* at 6, 20-21, 34-35, 38, 40-41.

[15] *Id.* at 36.

the Debtor's arguments and ruled that it would "appoint McKinley, Incorporated ["McKinley"] as receiver for the [P]roject and that that [would] be done immediately."[16] On November 1, 2006, the state court entered an order appointing McKinley as the receiver (the "Receivership Order").[17]

In the Receivership Order, the state court made the following findings, among others:

C. [Debtor] has defaulted in the performance of its obligations under the Loan Documents identified and defined in the Complaint and [Canyon] has provided notice of such default.

D. Further, [Debtor] has failed or refused to pay necessary and immediate expenses to preserve and protect the Property, all of which constitutes waste and which jeopardizes the security interest of [Canyon] and other parties having an interest in the Property. In this circumstance, MCL 600.2927 as well as the provisions of the Loan Documents authorize this Court to appoint a receiver.

E. Additionally, the requirements under MCL 570.1122(1) are met in this case, namely:

(i) The improvements and construction to the Property are incomplete;

(ii) The Indebtedness due [Canyon] secured by the Mortgage is in default, and, therefore, the Mortgage is in default; and

(iii) [Canyon], the mortgagee, is likely to sustain substantial loss, if the improvements to the Property are not completed.[18]

## C. Terms of the Receivership Order, and the receivership loan

At the time of the Receiver's appointment, the Debtor estimates that the Project was

---

[16] *Id.* at 57.

[17] Receivership Order (Ex. C to Docket # 7).

[18] *Id.* at 2-3.

6

about 65% complete.  Canyon presented credible evidence, however, that at that time the Project

was only about 50% completed, and needed reworking of some of the work that had been done.[19]

In any case, the Receivership Order gave the Receiver broad authority over the Debtor's property

and the Project, the purpose of which was "to protect the interests of all interested parties in the

Property."[20]  The Order gave the Receiver authority and direction not only to protect and preserve

the Property, but also to complete construction of the Project:

> [T]he Receiver is authorized and directed to take immediate
> possession and full control of the Receivership Property and to take
> any and all necessary and appropriate action to effectuate his
> possession and sole control over same in order to prevent waste
> and to preserve, secure, safeguard, **winterize and complete
> construction of the Receivership Property**.[21]

To this end, the Receivership Order authorized the Receiver to "immediately enter into a

loan agreement with [Canyon] to borrow funds to winterize, safeguard, and complete

construction of the Receivership Property and to lease and potentially sell such property, in

accord with the terms of MCL 570.1122, *et seq.*"[22]  The Order authorized the Receiver to borrow

up to $19.7 million from Canyon "to, among other things, winterize, safeguard and complete

construction of the Receivership Property."[23]  Such loan was to be "subject to terms acceptable to

[Canyon] and upon the approval of the Court," and was to be secured by a "super priority" lien,

---

[19] Testimony of Paul Marcus.  (All citations to "testimony" in this opinion are to testimony given during the evidentiary hearing held on September 19 and 20, 2017.)

[20] Receivership Order at 3.

[21] *Id.* at 4 (emphasis added).

[22] *Id.* at 4-5.

[23] *Id.* at 5.

7

"senior to all other liens," on the Receivership Property.[24]

Shortly after its appointment, the Receiver and Canyon jointly sought the state court's approval of proposed loan documents for the Receivership Loan. The Debtor objected, and the state court held a hearing on November 17, 2016, during which the court heard arguments and then granted the joint motion to approve the loan documents.[25] Thereafter, the Receiver and Canyon entered into the Receivership Loan, in a loan agreement dated as of November 22, 2016 and related documents.[26]

## D. Pre-petition activity under the state court receivership

During the more than 10-month period after the state court appointed the Receiver and before the Debtor filed this bankruptcy case, there was considerable activity on the Project by the Receiver and its chosen general contractor on the project, O'Brien Construction Company, Inc. And there was a great deal of litigation in the state court case, between the Debtor and some of the construction lien holders on the one hand, and the Receiver and Canyon on the other hand.

The state court case has been contentious. For example, almost immediately after appointment of the Receiver, the Debtor appealed the Receivership appointment and sought a stay pending appeal. The Debtor also sought an order requiring the Receiver to use the Debtor's

---

[24] *Id.* at 5, 6.

[25] Tr. of November 17, 2016 state court hearing (Docket # 103, Ex. 2) at 67-80. The state court entered its order approving the loan documents on November 21, 2016. (*See* Docket #103, Ex. 1 at 4 (state court docket entry of 11/21/2016)).

[26] Copies of these loan documents were admitted into evidence during the evidentiary hearing as Creditor's Exhibits S-3, S-4, and S-5, and as Debtor's Exhibit 60. (In this opinion, the Court will cite the exhibits admitted into evidence during the evidentiary hearing as "DX-__" for the Debtor's exhibits and "CX-__" for Canyon's exhibits. With respect to the Debtor's exhibits, citation to a particular numbered exhibit is to the tab number in the Debtor's exhibit books that were presented during the evidentiary hearing. Debtor's Exhibit 60, just referred to, for example, is cited as DX-60.)

preferred general contractor at the time, C.E. Gleeson Constructors, Inc., in place of the

Receiver's chosen contractor O'Brien.[27] The state court heard these motions on November 17,

2016, and denied them.[28] The Debtor then filed a motion for reconsideration of the Receivership

order on December 8, 2016, which the state court denied on December 19, 2016.[29] The Debtor

appealed the Receivership order to the Michigan Court of Appeals, where the appeal remains

pending.[30] The Debtor thereafter filed various oppositions and/or objections against the Receiver

in the state court. The state court litigation has also included various motions and objections

filed by some of the creditors claiming construction liens predating the receivership. This

includes motions by Gaylor Electric, Inc. ("Gaylor") and Quandel seeking relief from, and

amendment of, the Receivership Order, a motion by Gaylor for leave to file a complaint against

the Receiver for claimed breaches of fiduciary duty, and objections by Gaylor and Quandel to

reports of the Receiver.[31] These matters were heard by the state court on June 22, 2017, and the

Gaylor and Quandel motions were denied and their objections were overruled.[32]

---

[27] Quandel Construction Group, Inc. had been the Debtor's general contractor on the Project, but disputes between the Debtor and Quandel led the Debtor to terminate Quandel, effective October 17, 2016. (*See* CX-N, CX-O).

[28] Tr. of November 17, 2016 state court hearing (Docket # 103, Ex. 2) at 29-32, 54-58. The state court entered its order approving the loan documents on November 21, 2016. (*See* Docket # 103, Ex. 1 at 4 (orders at state court docket entries of 11/21/2016)).

[29] *See* Docket # 103, Ex. 1 at 4,5 (state court docket entries of 12/8/2016 and 12/19/2016).

[30] Schubiner Aff. (Docket # 7) at 8 n. 2.

[31] The motions by Gaylor and Quandel were concurred in by two other construction lien claimants, Amthor Steel and Zeeland Lumber and Supply Co. (*See* Docket # 109, Exs. 4, 5).

[32] Tr. of June 22, 2017 state court hearing (Docket # 103, Ex. 7) at 15, 27, 32, 47, 57. The state court entered its orders reflecting these rulings on June 23, 2017. (*See* Docket # 103, Ex. 1 at 15 (orders at state court docket entries of 6/23/2017); Docket # 109, Exs. 7-9 (copies of these state court orders)).

9

Most recently in the state court case, on August 31, 2017, the Receiver and Canyon filed a joint motion seeking to increase the total amount of the Receivership Loan that the Receiver is authorized to borrow, in order to complete the Project.  In round numbers, the motion sought to increase the maximum borrowing amount from the original maximum of $19.7 million (approved in November 2016) to $37.5 million, an increase of $17.8 million.[33]  The motion alleged, among other things, that: (1) "[s]ince entry of the Receivership Order, the Receiver has dutifully executed his obligations and has taken all necessary steps to complete the Project," and to date, had incurred costs of $8.9 million; (2) the remaining undrawn amount of the original $19.7 million Receivership Loan was insufficient to complete construction of the Project; (3) the original $19.7 million loan authorization had been based on the Debtor's budget, which had proven inadequate and unrealistic; and (4) the costs to complete the Project were significantly higher because of deficient work done by the Debtor and other specified problems caused by the Debtor.

The joint motion was noticed for a hearing that was to have occurred in the state court on September 7, 2017.[34]  The hearing did not occur, however, because the Debtor filed this bankruptcy case two days before the hearing.

### E.  The Debtor's bankruptcy case

The Debtor filed a voluntary petition for relief under Chapter 11 commencing this case on September 5, 2017.  As noted above, this was more than 10 months after the state court

---

[33]  Joint Motion to Approve Amended Receivership Loan Documents and Budget (DX-28) at 4-5; Docket # 103 (Ex. 1) at 18 (state court docket entry of 8/31/2017).

[34]  *See* DX-28 (notice of hearing therein).

appointed the Receiver.

In Part I of this opinion, above, the Court described the hearings it held on the Motion. In addition, the Court held a lengthy hearing on September 13, 2017, on two other, competing motions: (1) the Debtor's motion entitled "First Day Emergency Motion for Order Directing Receiver to Turn Over All Property to Chapter 11 Debtor-in-Possession and Related Relief" (Docket # 8); and (2) the motion filed by Canyon entitled "CAN IV Packard Square LLC'S Emergency Cross-Motion To: (1) Excuse Receiver from Turnover Provisions; and (2) Suspend the Bankruptcy Case" (Docket # 28). The Court is addressing those motions in a separate opinion and order being filed today.

## F. The Debtor's financing motion

In the Motion, the Debtor seeks an order under 11 U.S.C. § 364 to borrow up to $22,006,132 from Ardent Financial Fund, II, L.P. ("Ardent" or the "DIP Lender"), and of that loan amount, the Debtor seeks an interim order authorizing it to immediately borrow up to $1.5 million from Ardent, before entry of a final order. The purpose of the proposed $22 million loan is to enable the Debtor to complete construction of the Project. The Debtor's budget for the use of the $22 million loan proceeds includes money for this purpose, and it also includes money to finance certain expenses the Debtor expects to incur for its Chapter 11 bankruptcy case — namely, $980,000 for the Debtor's projected legal fees and payment of the Chief Restructuring Officer that the Debtor proposes to employ. The Debtor's loan budget also includes $4,690,282 in "Loan Costs."[35]

---

[35] These numbers are taken from DX-37, which the Debtor's Craig Schubiner testified is the Debtor's most recent DIP loan budget.

11

It is undisputed that without post-petition financing, the Debtor has no money with which to fund its Chapter 11 bankruptcy case or perform any work on the Project.

To secure repayment of the proposed DIP loan, the Motion seeks an order granting Ardent a lien that will "prime" all other liens on the Debtor's property — that is, a lien that will have priority over all other liens, under 11 U.S.C. § 364(d)(1). The Motion also seeks an order granting Ardent a super-priority administrative expense to secure full repayment of the proposed DIP loan, under 11 U.S.C. § 364(c)(1). The Debtor says that it is unable to obtain post-petition financing without such a priming lien and super-priority administrative expense being granted to the lender.

Thus, if approved, the lien securing the Debtor's $22 million DIP loan would have priority over the existing liens that Canyon has to secure repayment of its Receivership Loan and its Construction Loan, and priority over all construction liens that are held against the Project by contractors and subcontractors.

In order to obtain the proposed priming lien, of course, the Debtor must prove that "there is adequate protection of the interest[s] of the holder[s] of" the liens to be primed. 11 U.S.C. §§ 364(d)(1)(B), 364(d)(2). The Debtor contends that such adequate protection exists in this case because there is a substantial "equity cushion" -- *i.e.*, that the value of the Debtor's property (the Project real estate) is substantially greater than the total of all debts secured by any liens on the property, and that an equity cushion would still exist if the priming lien for the $22 million DIP loan were added. Canyon disputes this, and argues that the Debtor has failed to meet its burden to prove adequate protection. The dispute about adequate protection was the subject of the evidentiary hearing.

**IV. Discussion**

**A. The adequate protection dispute**

**1. Debtor's position**

The Debtor contends that the real property that is the subject of the Project now has, and will in the future have, a value substantially greater that the total debts secured by all liens against the property, including the priming lien to be granted to Ardent as the lender on the proposed DIP loan. The Debtor supports its claims about the value of the property with the opinions of its appraisal expert, David Abraham of Colliers International, who testified during the evidentiary hearing and whose written appraisal report was admitted into evidence.[36] In his report and in his testimony, Mr. Abraham opined that the real property has and will have the following present and future market values:

- an "As-Is" market value, as of August 1, 2017, of $73,800,000 (the "As Is Value");

- a future value, upon completion of the Project (which completion date Mr. Abraham assumes will be May 1, 2018) of $85,700,000 (the "Future Completion Value");

  and

- a future value, upon "stabilization" (*i.e.*, after the Project is both completed and fully rented) (which Abraham assumes will occur on August 1, 2018) of $89,400,000 (the "Future Stabilization Value").

To each of these three values Mr. Abraham adds $4,080,000, which he says is the present value of a certain tax increment financing agreement for which the Debtor has completed all

---

[36] Mr. Abraham's written report is DX-1, and is referred to in this opinion as the "Abraham Report."

requirements.[37]  Adding that to the three values just stated, the values become:

- $77,880,000 (As-Is Value on August 1, 2017);

- $89,780,000 (Future Completion Value on May 1, 2018);

  and

- $93,480,000 (Future Stabilization Value on August 1, 2018).[38]

With respect to the value of liens on the property, the Debtor argues that these range from a total of $33,624,368.94 (Debtor's contention) to a maximum of $55,289,851.38 (the "worst case scenario" from the Debtor's perspective, according to the Debtor's Craig Schubiner).[39]  The Debtor presents these two different lien totals as part of its adequate protection case, in large part because the Debtor disputes the amount that Canyon claims it is owed on its loans and the amounts Canyon and some of the lien claimants say is owing on construction liens.

When the proposed priming lien for the $22,000,000 DIP loan is added to the above lien amounts, the total liens would be in the range of $55,624,368.94 to $77,289,851.38.  Even the higher of these two amounts, according to the Debtor, is below the market value of the property, no matter which of the three values opined by Mr. Abraham is used ($77,880,000 "As-Is" value as of August 1, 2017; $89,780,000 Future Completion Value on May 1, 2018; or

---

[37]  The Debtor and Canyon have not disputed the $4,080,000 component of Mr. Abraham's valuation, or that the $4,080,000 amount should be included in the value of the property for purposes of deciding the issue of adequate protection.

[38]  Abraham Report at 3; testimony of David Abraham.

[39]  These numbers are taken from a document entitled "Adequate Protection Summary" (DX-33) prepared by the Debtor's Craig Schubiner, who testified about it during the evidentiary hearing.  The lower of these two numbers, according to Schubiner's summary, consists of a balance owing to Canyon of $31,479,443.25 plus "mechanics liens" totaling $2,144,925.69.  The higher of these two numbers (the "worst case scenario") according to Schubiner's summary, consists of a balance owing to Canyon of $51,000,000.00 plus "mechanics liens" totaling $4,289,851.38.

14

$93,480,000 Future Stabilization Value on August 1, 2018). And, the Debtor emphasizes, the $22 million DIP loan would only be advanced over time, as progress toward completion of the Project occurred. Because of this, the Debtor argues, the value of the Project would be increasing toward the $89,780,000 Future Completion Value as the DIP loan advances move upward toward the full $22 million priming lien amount.

## 2. Canyon's position

Canyon disputes Debtor's contentions, both as to the value of the property and as to the amount of debt secured by existing liens against the property.

In support of its contentions about value, Canyon relies largely upon the testimony and written report of its appraisal expert, Timothy A. Eisenbraun, discussed below.[40] Canyon and its expert Mr. Eisenbraun contend that the Abraham Report and Mr. Abraham's opinions about the value of the property are not properly supported, are based on faulty assumptions, are unreliable, and overstate the value of the property.

With respect to the amount of debt secured by existing liens, Canyon contends that the debt owing to it totals $50,710,493.64 as of August 31, 2017 (consisting of $41,041,777.07 owing on the Construction Loan and $9,668,716.56 owing on the Receivership Loan), with interest accruing on this debt at the rate of $640,273.48 per month.[41] And Canyon contends that construction liens against the property total $8,914,852.85 — consisting of a lien in favor of the Project's former general contractor, Quandel, of $5,968,282.49 plus a lien in favor of the current

---

[40] Mr. Eisenbraum wrote a report rebutting the Abraham Report. Eisenbraun's report is CX-D, and was admitted into evidence during the evidentiary hearing, along with Mr. Eisenbraun's testimony. (Mr. Eisenbraun's report is referred to in this opinion as the "Eisenbraun Report.")

[41] *E.g.*, CX-A; CX-U; CX-V; CX-W; testimony of Kevin Scholz.

15

general contractor, O'Brien Construction Company, Inc., of $2,946,570.36.[42]  Thus, according to

Canyon, for purposes of the adequate protection analysis, the existing liens total at least

$59,625,346.49 as of August 31, 2017, and that lien total is increasing by the amount of interest

accruing after August 31, 2017, at the rate of at least $640,273.48 per month.  The

$59,625,346.49 sum, plus the $22,000,000 amount of the proposed priming lien under the DIP

loan the Debtor seeks, totals $81,625,346.49.  And, Canyon argues, the Debtor has not met its

burden of proving that the value of the property exceeds, let alone substantially exceeds, this lien

total amount.

## B.  The Court's findings and conclusions about lien amounts, value, and adequate protection

## 1.  Applicable law

Section 364(d) of the Bankruptcy Code states:

(d)(1) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if--

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).  The issue before the Court is whether, as required by § 364(d)(1)(B), there is

---

[42] *E.g.,* CX-L; CX-P; testimony of Kevin Scholz; testimony of Matthew Mason; testimony of Paul Marcus.

adequate protection of the interests of Canyon and the other lien creditors whose liens will be primed by the lien of the DIP Lender, if the Motion is granted. The Debtor has the burden of proving such adequate protection, by a preponderance of the evidence. *See* 11 U.S.C. § 364(d)(2); *see generally Grogan v. Garner*, 498 U.S. 279, 286 (1991).

In determining whether the Debtor has satisfied this burden, the Court is mindful of the fact that "granting post-petition financing on a priming basis is extraordinary and is allowed only as a last resort." *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 441 (Bankr. S.D.N.Y. 2010) (citations omitted); *see also Bland v. Farmworker Creditors,* 308 B.R. 109, 115 (S.D. Ga. 2003) (internal quotation marks and citation omitted) ("[T]he § 364(d) process is considered rare and extraordinary . . . ."); *In re Seth Co., Inc*., 281 B.R. 150, 153 (Bankr. D. Conn. 2002) (citations omitted) ("The ability to prime an existing lien is extraordinary, and in addition to the requirement that the [debtor-in-possession] be unable to otherwise obtain the credit, the [debtor-in-possession] must provide adequate protection for the interest of the holder of the existing lien[.]"); *In re Qualitech Steel Corp*., 276 F.3d 245, 248 (7th Cir. 2001) (citation omitted) ("Section 364(d) is supposed to be a last resort. The statutory text itself conveys that message[.]").

In a similar vein, courts have held that the bankruptcy court must exercise particular caution in determining adequate protection in the face of a proposed priming lien:

> The determination of adequate protection is a fact-specific inquiry. "Its application is left to the vagaries of each case . . . but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." *In re Beker Industries Corp*., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986). **"Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly**

17

> cautious when assessing whether the creditors so displaced are
> **adequately protected."** *In re First South Savings Association*, 820
> F.2d 700, 710 (5th Cir.1987).
> . . . .
>
> A finding of adequate protection should be premised on facts, or on
> **projections grounded on a firm evidentiary basis**.

*In re Mosello*, 195 B.R. 277, 289, 292 (Bankr. S.D.N.Y. 1996) (emphasis added).

> The authorization to prime an existing lien should not be read as
> authorization to increase substantially the risk of the existing
> lender in order to provide security for a new, post-petition lender.
> When the effect of the new borrowing with a senior lien is merely
> to pass the risk of loss to the holder of the existing lien, the request
> for authorization should be denied.

*In re Windsor Hotel, L.L.C.*, 295 B.R. 307, 314 (Bankr. C.D. Ill. 2003).

Section 361 of the Bankruptcy Code, entitled "Adequate protection," lists ways a debtor

can provide adequate protection.  It states:

> When adequate protection is required under section . . . 364 of this
> title of an interest of an entity in property, such adequate protection
> may be provided by--
>
> > (1) requiring the trustee to make a cash payment or
> > periodic cash payments to such entity, to the extent
> > that the stay under section 362 of this title, use, sale,
> > or lease under section 363 of this title, or any grant
> > of a lien under section 364 of this title results in a
> > decrease in the value of such entity's interest in such
> > property;
> >
> > (2) providing to such entity an additional or
> > replacement lien to the extent that such stay, use,
> > sale, lease, or grant results in a decrease in the value
> > of such entity's interest in such property; or
> >
> > **(3)** granting such other relief, other than entitling
> > such entity to compensation allowable under section
> > 503(b)(1) of this title as an administrative expense,
> > **as will result in the realization by such entity of**

18

> **the indubitable equivalent of such entity's
> interest in such property.**

11 U.S.C. § 361 (emphasis added).

Sections 361(1) and 361(2) do not apply, because the Debtor is not offering cash payments or replacement liens as adequate protection. Rather, § 361(3) applies, so the Debtor must provide, as adequate protection, the "indubitable equivalent" of the secured creditors' interest in the property securing their claims. "Indubitable equivalence requires such relief as will result in the realization of value [by the secured creditor]." *In re Vander Vegt*, 499 B.R. 631, 637 (Bankr. N.D. Iowa 2013) (internal quotation marks and citation omitted), *aff'd sub nom. First Sec. Bank & Tr. Co. v. Vegt*, 511 B.R. 567 (N.D. Iowa 2014). To be the "indubitable equivalent" of a secured creditor's interest in property, the proposed adequate protection must both compensate the secured creditor for the present value of that interest, and insure the safety of that interest. *In re Pac. Lifestyle Homes, Inc.*, No. 08-45328, 2009 WL 688908, at *9 (Bankr. W.D. Wash. Mar. 16, 2009) (relying on in *In re Murel Holding Corp.*, 75 F.2d 941, 942 (2d Cir.1935), and *In re Am. Mariner Indus., Inc.*, 734 F.2d 426, 431 (9th Cir.1984)), *effectively overruled on other grounds by United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365 (1988)).

In this case, the Debtor argues, in effect, that the secured creditors will realize the value of their interests in the collateral from the future increase in the value of the collateral which will result when the Project is completed and the residential units and retail spaces are leased.

"In general, courts have denied financing that included a priming lien where adequate protection relied on increased value in highly speculative circumstances, where time periods for value increase were tight, or where a debtor faced red tape or other hurdles." *Vander Vegt*, 499

B.R. at 638.

Numerous reported cases confirm the need for courts to use great caution in granting a priming lien, where adequate protection is based on predictions of future value. For example:

- *In re YL West 87th Holdings I LLC,* 423 B.R. 421, 423, 443 (Bankr. S.D.N.Y. 2010) (debtor moved for authority to obtain debtor-in-possession financing secured by a senior lien that would prime the liens of two secured creditors, in order to construct and improve a multi-use development; the court denied the motion due to the "highly speculative" nature of the project, and stated that "there [were] numerous contingencies in this case with respect to whether the [d]ebtor could successfully complete construction of the [project] and its ultimate value, if completed");

- *Suntrust Bank v. Den-Mark Constr., Inc.* (*In re Den-Mark Constr., Inc.*)*,* 406 B.R. 683, 702 (E.D.N.C. 2009) (citation omitted) (holding that a secured creditor "[had] not been sufficiently assured of the indubitable equivalence of its existing security," where the debtor, a real estate developer, sought authority to obtain post-petition financing on a priming basis to develop and construct residences on real properties on which the creditor had liens; debtor argued that "improvements to the subject properties [would] increase their value, thereby compensating [the secured creditor] for the loss of its priority to [the lender];" but the court explained that "'Congress did not contemplate that a secured creditor could find its position eroded and, as compensation for the erosion, be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects'");

- *In re Strug-Division LLC*, 380 B.R. 505, 512, 515 (Bankr. N.D. Ill. 2008) (debtors

argued that the renovation of an apartment complex on which secured creditor had an existing lien would "result in [an increase in] value [of the apartment complex far] exceeding debt, and that this 'equity cushion' [would] protect [the secured creditor] even if its loans [were] primed"; and "[t]he only adequate protection offered by the [d]ebtors for the proposed subordination of [the secured creditor's] liens [was] the increase in property value resulting from the rehab work"; court held that the debtors could not obtain a loan with a priming lien under § 364(d)(1), reasoning that debtors could not provide the secured creditor with the "indubitable equivalent" of its present interests and thus could not provide adequate protection, because "the 'equity cushion' would be small and therefore the risk of being primed would be entirely on [the secured creditor]");

- *In re St. Petersburg Hotel Assocs., Ltd.*, 44 B.R. 944, 945–46 (Bankr. M.D. Fla. 1984) (debtor sought post-petition financing for improvements to a hotel which it needed to make to secure a "Holiday Inn" franchise; debtor argued that this would increase the value of the hotel; court denied debtor's motion to obtain credit on a superpriority basis because the secured creditor whose lien would be primed was already undersecured by approximately $1 million and because "[a]n examination of the assumptions relied on by the [d]ebtor which form[ed] the basis for the proposition that the [secured creditor was] adequately protected reveal[ed] that the assumptions [were] mere expectations, many of which [were] highly speculative and unrealistic").

- *Resolution Trust Corp. v. Swedeland Dev. Grp., Inc.* (*In re Swedeland Dev. Grp., Inc.*), 16 F.3d 552, 566 (3rd Cir. 1994) (Third Circuit Court of Appeals held that in

21

the case before it, "[t]he bankruptcy court was . . . wrong in finding that [the secured

creditor] derived adequate protection from the increased value of [a real-estate

development] project through [the debtor's] contemplated continuing construction,"

because "the evidence [did] not establish that the property ha[d] increased in value to

compensate [the secured creditor] for the loss of its priority to [the post-petition

lender]." The Third Circuit reasoned that some of the debtor's projections were

"belied by [the debtor's] historical performance; "the 5-month sales projections . . .

were below expectations;" and "the cash flow projections upon which the bankruptcy

court relied were deficient as they did not provide for a reasonable developer's profit

nor discount the projected eight-year cash flow to present value." *Id.* at 566. Given

the "inherently risky circumstances of [the] Chapter 11 [case];" the debtor's reliance

on projections rather than reliable objective quantifiable evidence; and the lack of any

new consideration being offered by the debtor, the debtor had not satisfied its burden

of showing that the interests of the secured creditor were adequately protected.)

## 2.  The debt amounts currently secured by liens that would be primed

Canyon presented substantial, credible evidence that there are construction liens against

the Debtor's property consisting of (1) $5,968,282.49, based on the lien filed by the Project's

former general contractor, Quandel, plus (2) a lien in favor of the current general contractor,

O'Brien Construction Company, Inc. ("O'Brien"), of $2,946,570.36. These liens total

$8,914,852.85.[43] Quandel was the Debtor's general contractor on the Project, until the Debtor

terminated Quandel in October 2016, shortly before the Receiver was appointed by the state

---

[43] *See* record citations in footnotes 41 and 42 of this opinion.

court.  Quandel's filed lien of $5,968,282.49 includes amounts owed by Quandel to subcontractors, some of whom also filed lien notices against the Project.  Because of this possible duplication in the filed lien amounts, the Court does not count the dollar value of liens filed by any of the subcontractors for purposes of deciding the adequate protection issue.

During the evidentiary hearing, the Debtor attempted to prove that the valid amount of construction liens against the Project are less than asserted by Canyon.  But as part of its burden of proving adequate protection, the Debtor has the burden of proof regarding the amount of liens against the property.  And the Debtor failed to meet its burden of proving, by a preponderance of the evidence, that the valid lien amounts against the property are less than the sum of $8,914,852.85 shown by Canyon's evidence.  Similarly, Canyon presented substantial, credible evidence that its liens for the Construction Loan and the Receivership Loan total $50,710,493.64 as of August 31, 2017, with interest continuing to increase that lien amount at the rate of $640,273.48 per month thereafter.[44]  The Debtor failed to meet its burden of proving, by preponderance of the evidence, that the debt amount owing to Canyon, secured by Canyon's liens, is less than the amounts shown by Canyon's evidence.

For these reasons, the Court must assume, and finds and concludes, that for purposes of deciding the issue of adequate protection, the total amount of debt secured by liens against the Debtor's property is at least $59,625,346.49 as of August 31, 2017, and is increasing by the amount of interest accruing after that date at the rate of at least $640,273.48 per month.[45]  The

---

[44] *See* record citations in footnote 42 of this opinion.

[45] This $59,625,346.49 total is the sum of Quandel's lien of $5,968,282.49, O'Brien's lien of $2,946,570.36, and the secured debt owing to Canyon on the Construction Loan and the Receivership Loan totaling $50,710,493.64 as of August 31, 2017.

23

$59,625,346.49 sum, plus the $22,000,000 amount of the proposed priming lien under the DIP loan Debtor seeks, totals $81,625,346.49.[46]

## 3. The value of the property

"In some cases, the [equity] cushion alone is adequate to guarantee a party will receive the 'indubitable equivalent' of its interest in the property as permitted by 11 U.S.C. § 361(3). The adequacy of a[n equity] cushion amount must be evaluated on a case-by-case basis." *In re Schaller*, 27 B.R. 959, 962 (W.D. Wis. 1983) (citations omitted).

To succeed in proving adequate protection in this case, the Debtor must prove that an adequate equity cushion exists and will exist, through the interim period covered by an interim order (with a DIP loan maximum amount of $1.5 million during the interim period), and into the future as the full $22,000,000 DIP loan is to be advanced to the Debtor.

---

[46] The Court notes that the priority of Canyon's liens, as against the construction liens, is a matter of some dispute between Canyon and the other lien holders. Canyon contends that its liens, both as to the Receivership Loan and the Construction Loan, have priority over the construction liens. But, as Canyon states, in the state court "the construction lien claimants have asserted that their liens are senior to the liens of Canyon," and "[t]he state court had not yet adjudicated the issue when the bankruptcy petition was filed." (Canyon's Objection to Mot. (Docket # 53) at 4 n.3). And in this Court, the construction lien claimants who filed timely "limited" objections to the Debtor's Motion all asserted that their liens at least have priority over the Debtor's Construction Loan. (*See* Docket # 49 at 1-2 (Quandel's limited objection); Docket # 42 at 4 ¶ 11 (Gaylor Electric, Inc.'s limited objection); Docket # 59 at ¶1 (Zeeland Lumber and Supply Co.'s limited objection).) Canyon's evidence shows that the debt owing on the Construction Loan is $41,041,777.07 of the total debt owing to Canyon, as of August 31, 2017. *See* discussion at record citations in Part IV.A.2 of this opinion. So if the construction lien claimants prevail in their priority arguments, Canyon's lien securing roughly $41 million of the total debt owing to Canyon could be last in priority among the lien holders.

This Court is not resolving any priority disputes between the existing lien claimants at this time. That is beyond the scope of the evidentiary hearing and the dispute over adequate protection, which both the Debtor and Canyon agree must be decided urgently in the very early days of this bankruptcy case. As a result, the Court must consider the value and amount of all of the existing liens in deciding whether the Debtor has proven an adequate protection equity cushion, not just the value and amount of the liens held by the objecting creditor Canyon. Neither the Debtor nor Canyon has argued otherwise; rather, the Debtor and Canyon each have presented their case regarding adequate protection on this basis.

Turning now to the dispute between the Debtor and Canyon regarding the value of the Debtor's real property, the Court first notes that all three of the valuation amounts opined by the Debtor's appraisal expert, Mr. Abraham, are based on projections of the *future value* of the property after the Project is fully constructed ("completed") and, thereafter, when the Project is fully rented ("stabilized"). This is obviously so for Mr. Abraham's $85,700,000 Future Completion Value on May 1, 2018 and his $89,400,000 Future Stabilization Value on August 1, 2018. But it is also true with respect to Mr. Abraham's opinion of the $73,800,000 As-Is Value on August 1, 2017.

To arrive at the As-Is Value on August 1, 2017, Mr. Abraham began with the $89,400,000 Future Stabilization Value on August 1, 2018, and deducted certain adjustments from that value. The total of these deductions was $15,600,000. Mr. Abraham subtracted the $15,600,000 from the $89,400,000 Future Stabilization Value to arrive at the $73,800,000 As-Is Value on August 1, 2017. The largest of these deductions was for $11,880,000 as the "total cost to complete" the development between now and the August 1, 2018 assumed date of stabilization. The logic of this approach — deducting the assumed future cost to complete the Project from the Future Stabilized Value to help arrive at a current As-Is Value — is that the current value of the property in its partially-completed, completely un-rented (and therefore non-income producing) state is what the property will be worth after the Project is completed and fully rented, less the cost it will take to move the project from its current state to the future completed and stabilized state. (Mr. Abraham's other deduction adjustments were $2,357,371 in "Total Lease-Up" costs and $1,382,195 in "Total Other Income Loss.")[47]

---

[47] *See* Abraham Report at 3, 101, 102.

Thus, all of Mr. Abraham's opinions about the value of the Debtor's real property, at each of the three different times, are based on projections of what the value of the property will be in the future after construction of the Project is completed, and in the case of the As-Is Value and the Future Stabilization Value, after the apartments and retail space in the Project are fully rented and income-producing.

But the Project is far from completed, and no part of the Project's apartment space or retail space is occupied and rented, so the Project is not currently producing any income. And there is inherent uncertainty about the future — including how long it will take and how much it will cost in the future to complete the Project and to fully rent it, and how much rental income will be generated in the future. For these reasons alone, the Court finds each of the three valuation amounts ascribed to the Debtor's real property by the Debtor's appraisal expert to be inherently uncertain and speculative to some extent.

In addition, the Court finds that there are several major flaws in the Debtor's valuation evidence that make it unreliable. These are discussed later in this opinion.

But first, the Court will focus on what the adequate protection picture is, using Mr. Abraham's projected values. Even using those, the Debtor has failed to prove adequate protection.

The Court will begin by considering Mr. Abraham's "As-Is Value" of the Debtor's real property, on August 1, 2017, which is $73,800,000, plus the $4,080,000 present value of the tax increment financing agreement, for a total of $77,880,000. This current value is *less than* the sum of (1) the existing liens, which total at least $59,625,346.49 as of August 1, 2017, plus (2) the $22,000,000 amount of the proposed priming lien under the DIP loan the Debtor seeks. This

lien sum equals $81,625,346.49. Thus, the total amount of the proposed priming lien plus the existing liens is greater than the current, As-Is Value by $3,745,346.49. This, of course, is an equity deficit, not an equity cushion.

But the Debtor's view is that this is not a fair comparison of value to lien amounts, because under the DIP loan the Debtor seeks, the loan would only be disbursed in periodic advances as construction of the Project progressed and moved toward completion. The Debtor argues that as the Debtor would draw upon the $22,000,000 DIP loan gradually over time, the value of the real property would be increasing correspondingly, and would be higher than the current As-Is Value of $77,880,000. Instead, the value would be moving toward Mr. Abraham's projected $89,780,000 Future Completion Value and projected $93,480,000 Future Stabilization Value.

There are at least two problems with the Debtor's argument. First, the Debtor failed to prove with any evidence how much the value of the property would increase as DIP loan proceeds were gradually being spent on constructing the Project. The Debtor's counsel argued, in effect, that the value of the Project would continually increase by at least as much as the amount of the DIP loan money being spent on the Project. But the Debtor did not prove this.

Second, the Debtor's argument overlooks the fact that as time passes, the amount of the existing liens will be increasing by at least the amount of interest accruing on Canyon's loans — at least $640,273.48 per month. Thus, by the date on which Mr. Abraham projects a $89,780,000 Future Completion Value (May 1, 2018), the existing liens would have increased from the $59,625,346.49 amount as of August 31, 2017, by at least $5,122,187.80 ($640,273.48 per month times 8 months), to a total of at least $64,747,534.33. Adding the $22 million DIP loan priming

lien to that equals a total of $86,747,534.33 in liens against the property as of May 1, 2018. This is only $3,032,465.67 less than Mr. Abraham's projected Future Completion Value on May 1, 2018. This is a very slim equity cushion. It is only 5.43% of the above projected amount of Canyon's liens as of May 1, 2018,[48] and more importantly, it is only 4.68% of the projected amount of all the existing liens to be primed, as of May 1, 2018.[49] It amounts to only 3.38% of Mr. Abraham's projected value of the Debtor's real property on May 1, 2018.[50] The Court finds that this is not enough of an equity cushion to be adequate protection of the existing liens.

Similarly, by the date on which Mr. Abraham projects a $93,480,000 Future Stabilization Value (August 1, 2018), the existing liens would have increased from the $59,625,346.49 amount as of August 31, 2017, by at least $7,043,008.28 ($640,273.48 of interest per month times 11 months), to a total of at least $66,668,354.77. Adding the $22 million DIP loan priming lien to that equals a total of $88,668,354.77 in liens against the property as of August 1, 2018. This is only $4,811,645.23 less than the projected Future Stabilization Value on August 1, 2018. This is a slightly higher equity cushion than the one projected for May 1, 2018, but this August 1, 2018 equity cushion too is a very slim equity cushion. It is only 8.33% of the projected amount of Canyon's liens as of August 1, 2018,[51] and more importantly, it is only 7.22% of the projected

---

[48] Canyon's liens would total at least $55,832,681.48 as of May 1, 2018 ($50,710,493.64 as of August 31, 2017 plus 8 months' interest thereafter totaling $5,122,187.84). The above projected equity cushion amount on May 1, 2018 of $3,032,465.67 divided by $55,832,681.48 equals .0543, or 5.43%.

[49] As noted above, the existing liens (*i.e.*, those other than the $22 million DIP loan lien) would total at least $64,747,534.33 as of May 1, 2018. The above projected equity cushion amount on May 1, 2018 of $3,032,465.67 divided by $64,747,534.33 equals .0468, or 4.68%.

[50] $3,032,465.67 divided by $89,780,000 equals .0338, or 3.38%.

[51] Canyon's liens would total at least $57,753,501.92 as of August 1, 2018 ($50,710,493.64 as of August 31, 2017 plus 11 months' interest thereafter totaling $7,043,008.28). The above projected equity

amount of all the existing liens to be primed, as of August 1, 2018.[52]  It amounts to only 5.15% of

Mr. Abraham's projected value of the Debtor's real property on August 1, 2018.[53]  The Court

finds that this is not enough of an equity cushion to be adequate protection of the existing liens.

The Court finds these equity cushion percentages just calculated to be too small to be

adequate protection of the existing liens, in large part because they are based on projections of

value that are several months into the future, and that are inherently uncertain and speculative, as

discussed above.  This uncertainty and these small equity cushion percentages leave too great a

margin of risk to the existing lien holders — too great a risk that the proposed priming DIP loan

lien would impair the value of the existing liens.  *See generally In re Windsor Hotel, L.L.C.*, 295

B.R. at 314 (priming lien must be denied "[w]hen the effect of the new borrowing with a senior

lien is merely to pass the risk of loss to the holder of the existing lien").  Other cases have found

equity cushion percentages in this range insufficient to be adequate protection.  *See Kost v. First

Interstate Bank of Greybull* (*In re Kost*), 102 B.R. 829, 831-33 (D. Wyo. 1989) (quoting, with

approval, *In re McKillips*, 81 B.R. 454, 458 (Bankr. N.D. Ill. 1987) (citations omitted): "[c]ase

law has almost uniformly held that an equity cushion of 20% or more constitutes adequate

protection;" and "[c]ase law has almost as uniformly held that an equity cushion under 11% is

insufficient to constitute adequate protection;" and "[c]ase law is divided on whether a cushion of

12% to 20% constitutes adequate protection"); *Drake v. Franklin Equip. Co.* (*In re Franklin*

---

cushion amount on August 1, 2018 of $4,811,645.23 divided by $57,753,501.92 equals .0833, or 8.33%.

[52]  As noted above, the existing liens (*i.e.*, those other than the $22 million DIP loan lien) would total at least $66,668,354.77 as of August 1, 2018.  The above projected equity cushion amount on August 1, 2018 of  $4,811,645.23 divided by $66,668,354.77 equals .0722, or 7.22%.

[53]  $4,811,645.23 divided by $93,480,000 equals .0515, or 5.15%.

*Equip. Co.*), 416 B.R. 483, 528-29 (Bankr. E.D. Va. 2009) (quoting above passage from *Kost* with approval, and citing numerous other cases; and finding an equity cushion of 4.87% to be insufficient).

Thus, even using Mr. Abraham's estimates of projected future values, the Court concludes that the Debtor failed to meets its burden of proving adequate protection by a preponderance of the evidence.

But even if the slim equity cushion amounts described above could be deemed adequate, the Debtor has not met its burden of proving them. These equity cushions are based on projected values of the Debtor's real property that have not been proven by reliable evidence. There are several significant flaws in the Debtor's appraisal evidence.

First, as he testified and described in more detail in his report, Mr. Abraham considered three general valuation approaches — the Income Capitalization Approach; the Sales Comparison Approach; and the Cost Approach. Of these three approaches, however, Mr. Abraham relied ultimately on only the Income Capitalization Approach. He stated in his report that "the [Income Capitalization Approach] warranted primary emphasis,"[54] but he actually stated that the two other approaches — the Cost Approach and the Sales Comparison Approach — are not reliable in this case:

> The cost approach, while consistent with the other findings, is of limited reliability because of the difficulty of accurately measuring the various forms of depreciation. . . . The sales comparison approach was also consistent with the findings of the other approaches. It had to, however, rely on comparisons that were relatively dissimilar and thus required extensive adjustments. Its reliability is limited as a result. . . . As a result, the conclusion

---

[54] Abraham Report at 135.

30

relies upon the findings of the income approach.[55]

Because the Debtor's own expert conceded that his Cost Approach and his Sales Comparison Approach are not reliable in this case, the Court finds them to be unreliable and will give them no weight in determining value in this case.

Second, and in any event, under all of the valuation approaches, all three of the values opined by Mr. Abraham are premised on significant, unproven assumptions. They are based on, among other things, the following assumptions: (1) that the total cost to complete the Project will be $11,880,000,[56] and that the Project will be completed by May 1, 2018, which is less than seven months from now. These are assumptions that were crucial to Mr. Abraham's appraisal values, and were provided to Mr. Abraham by the Debtor's Craig Schubiner. But the Debtor failed to prove these crucial assumptions by a preponderance of the evidence.

Canyon presented substantial, credible evidence that it will cost roughly $19 million to complete the Project, and that the Project cannot be completed until the end of October 2018.[57] The Debtor attempted to prove its much more optimistic assumptions, chiefly through the testimony of the Debtor's Craig Schubiner. But the Court finds the Debtor's evidence to be unpersuasive on these points, and finds the evidence presented by Canyon, including the testimony of the current general contractor O'Brien's Paul Marcus, to be more credible and persuasive. The Debtor failed to meet its burden of proving the truth and validity of its above assumptions by a preponderance of the evidence. This renders Mr. Abraham's appraisal values

---

[55] *Id.*

[56] This includes $10,800,000 plus a 10% ($1,080,000) contingency. *See* Abraham Report at 102.

[57] Testimony of Paul Marcus.

unreliably high.

Third, the Court agrees with several of the other criticisms of Mr. Abraham's appraisal opinions made by Canyon's appraisal expert Mr. Eisenbraun in his report and testimony. These include the following points, which are some, but not all, of Mr. Eisenbraun's criticisms. As Mr. Eisenbraun stated in his report, CX-D, in rebutting Mr. Abraham's appraisal report:

- The lease-up time to stabilize the project is unrealistic. The appraisal states that there is a 3-month window to finish and lease-up the property to an occupancy rate of 96.5 percent. The report does not indicate any pre-leasing for any of the apartments or the retail space. In fact, the receiver is working fully on the apartment units and no significant work has commenced with the retail space. No letters of intent (LOIs) have been brought to our attention for the retail space.

- The capitalization rate within the report is not supported. The appraisal utilizes a capitalization rate of 5.50 percent and states that the comparable sales are the best indication to support the rate. That stated, none of the comparable sales are located within Michigan. The comparable sales presented are located in the states of Colorado, New Jersey, Minnesota and Missouri. Despite the fact that local data is available, no local data to support the rate is presented. Within the report, it states, "*A rate slightly higher than 5.50%, or around the average of the supplemental comparable sales, say 5.84% seems most reasonable, and the comparable sales data is concluded to provide a rate of 5.75% for the subject.*" In the end, a rate of 5.50 percent was utilized. Within the report, it states, "*Currently capitalization rates for stabilized assets range from 5.50% to 10.50%, with an average of 6.25%.*" Based on the data presented within the report, a capitalization rate of 6.00 percent appears to be more inline within investor expectations within Michigan. Leaving all other assumptions aside, simply capitalizing the reported net operating income of $4,915,338 by 6.0 percent would result in a diminution of value of $7,500,000 (81,900,000 less $89,400,000).
  . . .

- The appraisal does not provide adequate support for apartment rent estimates. Basically, the appraisal has simply utilized the owner's asking rental rates and has utilized them to develop the Income

Capitalization Approach. The average asking rental rate for apartment units is $2.32 per square foot. Market data presented within the report has an average apartment rent of $1.85 per square foot. Within the report, Apartment Rent Comparables 1, 2 and 6 are the only properties not in the downtown area of Ann Arbor. Apartment Rent Comparables 7, 8 and 9 are true student housing projects near the University of Michigan and do not reflect the economics at the subject property. As shown on Page 68 of the report, the apartment rents modeled are at 110.2 percent of market rent.

- At 33,000 square feet, the size of the retail space is overstated. The architectural rendering provided by the client states that the actual square footage is 22,692 square feet. This additional 10,308 of square footage results in an overstatement of value. At the same time, the rental rates for the retail are overstated. The appraisal has built rental rates of $26.40 per square foot for the larger retail unit and $33.00 per square foot for smaller retail space within the subject. The appraisal report does not demonstrate support for market rent. Rent Comparables 1, 3 and 5 are located in Downtown Ann Arbor near the University of Michigan. Rent Comparables 2 and 4 are located within traditional retail developments. Comparable 2 is a Meijer retail outlet while Comparable 4 is located in an intensive retail development near Interstate 94. At the same time, the subject property does not have a typical layout. The retail area is set slightly below the road and is part of the U-Shape configuration positioned at the front of the building. It is unlikely that the subject property could generate the same retail levels found at superior locations with retail space that has greater visibility and appeal.
. . .

- On Page 91, the growth rates modeled appear to be aggressive. The appraisal has rent spikes for Year 2, 3 and 4 of 4.0, 5.0 and 4.0 percent per year. At the same time, no spikes are anticipated for expenses. Most indications state that the Michigan market has reached a point of stabilization and any additional recovery or growth is limited. Based on current market conditions, market participants arc not modeling rent spikes at this time.[58]

For these additional reasons, the Court finds the Debtor's appraisal evidence to be unpersuasive.

---

[58] Eisenbraun Report at 3-4.

For all of these reasons, the Court finds that the Debtor has failed to meet its burden of proving, by a preponderance of the evidence, adequate protection in the form of any equity cushion, let alone an adequate equity cushion, to protect the lien interests of the existing lien holders, including Canyon, if the proposed DIP loan and priming lien are approved.

## V. Conclusion

For the reasons stated in this opinion, the Court will enter an order denying the Motion.

**Signed on October 13, 2017**



/s/ Thomas J. Tucker
**Thomas J. Tucker**
**United States Bankruptcy Judge**